CBD:DSS/AAS
F.#2009R02380

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

HSBC BANK USA, N.A. and
HSBC HOLDINGS PLC,

        Defendants.

- - - - - - - - - - - - - - - - -X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ DEC 20 2012 ★

BROOKLYN OFFICE

I N F O R M A T I O N

Cr. No. 12-763
(T. 18, U.S.C., §§ 2 and
3551 et seq.; T. 31,
U.S.C., §§ 5318(h),
5318(i), 5322(b) and
5322(d); T. 50, U.S.C.,
§§ 1702 and 1705; T. 50,
U.S.C. App., §§ 3, 5 and
16)

THE UNITED STATES CHARGES:

## INTRODUCTION

At all times relevant to this Information, unless otherwise indicated:

1. Defendant HSBC Bank USA, N.A. was a federally chartered banking institution and subsidiary of HSBC North America Holdings, Inc. HSBC North America Holdings, Inc. was an indirect subsidiary of defendant HSBC Holdings plc.

2. Defendant HSBC Holdings plc was a financial institution holding company registered and organized under the laws of England and Wales.

3. Defendant HSBC Holdings plc, through its subsidiaries, conducted United States Dollar ("USD") clearing at

defendant HSBC Bank USA, N.A., as well as other financial institutions located in the United States.

4.   Defendant HSBC Bank USA N.A. was subject to oversight and regulation by the Department of the Treasury, Office of the Comptroller of the Currency ("OCC").

### THE BANK SECRECY ACT

5.   The Bank Secrecy Act ("BSA"), Title 31 U.S.C. Sections 5311 et seq., and its implementing regulations, which Congress enacted to address an increase in criminal money laundering activities utilizing financial institutions, required domestic banks, insured banks and other financial institutions to maintain programs designed to detect and report suspicious activity that might be indicative of money laundering and other financial crimes, and to maintain certain records and file reports related thereto that are especially useful in criminal, tax or regulatory investigations or proceedings.

6.   Pursuant to Title 31, United States Code, Section 5318(h)(1) and Title 12, Code of Federal Regulations, Section 21.21, defendant HSBC Bank USA, N.A. was required to establish and maintain an anti-money laundering ("AML") compliance program that, at a minimum:

> (a)   provided internal policies, procedures, and controls designed to guard against money laundering;

2

    (b)    provided for a compliance officer to coordinate and monitor day-to-day compliance with the BSA and AML requirements;

    (c)    provided for an ongoing employee training program; and

    (d)    provided for independent audit function programs.

7. Pursuant to Title 31, United States Code, Section 5318(i), defendant HSBC Bank USA, N.A. was required to establish due diligence, and in some cases enhanced due diligence, policies, procedures and controls that were reasonably designed to detect and report suspicious activity for correspondent accounts it maintained in the United States for non-U.S. persons.

### THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT

8. The International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Sections 1701 through 1706, authorized the President of the United States (the "President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States, when the President declared a national emergency with respect to that threat.

### The Iranian Sanctions

9. On March 15, 1995, President William J. Clinton issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat."

10. On May 6, 1995, President Clinton issued Executive Order 12959 to take additional steps with respect to the national emergency declared in Executive Order 12957 and impose comprehensive trade and financial sanctions on Iran. These sanctions prohibited, among other things, the exportation, re-exportation, sale and transportation, directly or indirectly, to Iran or the Government of Iran of any goods, technology or services from the United States or United States persons, wherever located. This prohibition included any transactions or financing of transactions by United States persons relating to goods or services of Iranian origin, and further prohibited any "transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding" such sanctions. On August 19, 1997, President Clinton issued Executive Order 13059 consolidating and clarifying Executive Orders 12957 and 12959 (collectively, the "Iranian

4

Executive Orders"). The Iranian Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Iranian Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transaction Regulations ("ITRs"), Title 31, Code of Federal Regulations, Part 560, implementing the sanctions imposed by the Iranian Executive Orders.

11. With the exception of certain exempt transactions, the ITRs prohibited, among other things, U.S. depository institutions from servicing Iranian accounts and directly crediting or debiting Iranian accounts. The ITRs also prohibited transactions by any U.S. person who evaded or avoided, had the purpose of evading or avoiding, or attempted to evade or avoid the restrictions imposed under the ITRs. The ITRs were in effect at all times relevant to the Information.

The Libyan Sanctions

12. On January 7, 1986, President Ronald W. Reagan issued Executive Order No. 12543, which imposed broad economic sanctions against Libya. One day later, President Reagan issued Executive Order No. 12544, which also ordered the blocking of all property and interests in property of the Government of Libya in the United States or under the possession or control of United States persons. President George H.W. Bush strengthened those

sanctions in 1992 pursuant to Executive Order No. 12801. These sanctions remained in effect until September 22, 2004, when President George W. Bush issued Executive Order 13357, which terminated the national emergency with regard to Libya and revoked the sanction measures imposed by the prior Executive Orders.

### The Sudanese Sanctions

13. On November 3, 1997, President Clinton issued Executive Order No. 13067, which imposed a trade embargo against Sudan and blocked all property and interests in property of the Government of Sudan in the United States or under the possession or control of United States persons. President George W. Bush strengthened those sanctions in 2006 pursuant to Executive Order No. 13412 (collectively, the "Sudanese Executive Orders"). The Sudanese Executive Orders prohibited virtually all trade and investment activities between the United States and Sudan, including, but not limited to, broad prohibitions on: (a) the importation into the United States of goods or services of Sudanese origin; (b) the exportation or re-exportation of any goods, technology or services from the United States or by a United States person, wherever located, to Sudan; (c) trade and service related transactions with Sudan by United States persons, including financing or facilitating such transactions; and (d)

6

the grant or extension of credits or loans by any United States person to the Government of Sudan. The Sudanese Executive Orders further prohibited "[a]ny transaction by a United States person or within the United States that evades or avoids, has the purposes of evading or avoiding, or attempts to violate any of the prohibitions set forth in [these orders]." With the exception of certain exempt or authorized transactions, the United States Department of Treasury, Office of Foreign Assets Control ("OFAC") regulations implementing the Sudanese Sanctions generally prohibited the export of services to Sudan from the United States.

### The Burmese Sanctions

14. On May 20, 1997, President Clinton issued Executive Order No. 13047, which prohibited both new investment in Burma by United States persons and the approval or other facilitation by a United States person, wherever located, of a transaction by a foreign person where the transaction would constitute new investment in Burma.

15. On July 28, 2003, President George W. Bush signed the Burmese Freedom and Democracy Act of 2003 ("BFDA") to restrict the financial resources of Burma's ruling military junta. To implement the BFDA and to take additional steps, President Bush issued Executive Order No. 13310 on July 28, 2003,

7

which blocked all property and interest in property of other individuals and entities meeting certain criteria. President Bush subsequently issued Executive Order Nos. 13448 and 13464, expanding the list of persons and entities whose property must be blocked. Executive Order No. 13310 also prohibited the exportation or re-exportation, directly or indirectly, to Burma of financial services from the United States, or by United States persons, wherever located, as well as the financing or facilitation, by a United States person, of any prohibited transaction with Burma by a foreign person.

### THE TRADING WITH THE ENEMY ACT

16. Beginning with Executive Orders and regulations issued at the direction of President John F. Kennedy, the United States has maintained an economic embargo against Cuba through the enactment of various laws and regulations. These laws, which prohibited virtually all financial and commercial dealings with Cuba, Cuban businesses and Cuban assets, were promulgated under the Trading With the Enemy Act ("TWEA"), Title 50, United States Code Appendix, Sections 1-44, and were generally administered by OFAC.

17. Unless authorized by OFAC, the Cuban Assets Control Regulations ("CACRs") prohibited persons subject to the jurisdiction of the United States from engaging in financial

8

transactions involving or benefiting Cuba or Cuban nationals, including all "transfers of credit and all payments" and "transactions in foreign exchange." Title 31, Code of Federal Regulations, Sections 515.201(a)(1) and 515.201(a)(2). Furthermore, unless authorized by OFAC, persons subject to the jurisdiction of the United States were prohibited from engaging in transactions involving property in which Cuba or Cuban nationals have any direct or indirect interest, including "[a]ll dealings in . . . any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States" and "[a]ll transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States." 31 C.F.R. §§ 515.201(b)(1), 515.201(b)(2). The CACRs also prohibited "[a]ny transaction for the purpose or which had the effect of evading or avoiding any of the prohibitions set forth in [the regulations]." 31 C.F.R. § 515.201(c).

COUNT ONE
(Failure to Maintain an Effective Anti-Money Laundering Program)

18. The allegations contained in paragraphs one through seven are realleged and incorporated as if fully set forth in this paragraph.

19. In or about and between January 2006 and December 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant HSBC Bank USA, N.A., a domestic financial institution, wilfully violated the Bank Secrecy Act, Title 31, United States Code, Sections 5318(h) and 5322(b), by failing to develop, implement and maintain an effective anti-money laundering program.

20. Specifically, the defendant HSBC Bank USA, N.A. knowingly and wilfully failed to implement and maintain effective policies, procedures and internal controls to: (a) obtain and maintain due diligence or "know your customer" information on financial institutions owned by HSBC Holdings plc; (b) monitor wire transfers from customers located in countries which it classified as "standard" or "medium" risk; (c) monitor purchases of physical U.S. dollars ("banknotes") from financial institutions owned by HSBC Holdings plc; and (d) provide adequate staffing and other resources to maintain an effective anti-money laundering program.

(Title 31, United States Code, Sections 5318(h) and 5322(b); Title 18 United States Code, Sections 3551 et seq.)

## COUNT TWO
(Failure to Conduct Due Diligence on Correspondent Bank Accounts Involving Foreign Persons)

21. The allegations contained in paragraphs one through seven are realleged and incorporated as if fully set forth in this paragraph.

22. In or about and between January 2006 and December 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant HSBC Bank USA, N.A., a domestic financial institution, wilfully violated the Bank Secrecy Act, Title 31, United States Code, Sections 5318(i) and 5322(d), by failing to conduct due diligence on correspondent bank accounts for non-United States persons.

23. As part of this offense, the defendant HSBC Bank USA, N.A. knowingly and wilfully failed to obtain and maintain due diligence or "know your customer" information on foreign financial institutions owned by HSBC Holdings plc for which it maintained correspondent accounts, information that if collected and maintained would have reasonably allowed for the detection and reporting of instances of money laundering and other suspicious activity.

(Title 31, United States Code, Sections 5318(i) and 5322(d); Title 18 United States Code, Sections 3551 et seq.)

## COUNT THREE
(International Emergency Economic Powers Act)

24. The allegations contained in paragraphs one through four and eight through fifteen are realleged and incorporated as if fully set forth in this paragraph.

25. In or about and between January 2001 and December 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant HSBC Holdings plc, together with others, knowingly, intentionally and wilfully facilitated prohibited transactions for sanctioned entities in Iran, Libya, Sudan and Burma.

(Title 50, United States Code, Sections 1702 and 1705; Title 18 United States Code, Sections 2 and 3551 et seq.)

## COUNT FOUR
(Trading with the Enemy Act)

26. The allegations contained in paragraphs one through four and sixteen through seventeen are realleged and incorporated as if fully set forth in this paragraph.

27. In or about and between January 2001 and December 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant HSBC Holdings plc, together with others, knowingly, intentionally and

12

wilfully facilitated transactions for sanctioned entities in Cuba.

(Title 50, United States Code Appendix, Sections 3, 5 and 16; Title 18 United States Code, Sections 2 and 3551 et seq.)

12/11/2012
DATE

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

12/11/2012
DATE

JAIKUMAR RAMASWAMY
Chief, Asset Forfeiture and
Money Laundering Section
Criminal Division
Department of Justice

12/10/2012
DATE

WILLIAM J. IHLENFELD II
United States Attorney
Northern District of West Virginia

13