UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

                               12 CR 763 (JG)

HSBC BANK USA, N.A. and
HSBC HOLDINGS PLC,

       Defendants.

- - - - - - - - - - - - - - - -X

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF

## THE DEFERRED PROSECUTION AGREEMENT

## PRELIMINARY STATEMENT

At a status conference held on December 20, 2012, the Court requested that the parties set forth why the Deferred Prosecution Agreement ("DPA") in this case adequately reflects the seriousness of the defendants' offense behavior, and why the agreement yields a result that is consistent with the goals of our federal sentencing scheme.  As described in greater detail below, the United States respectfully submits that the DPA adequately and accurately reflects the serious nature of the defendants' offense conduct and justly punishes them – thus deterring other financial institutions from engaging in similar conduct – while also creating an effective mechanism for ensuring and monitoring the defendants' ongoing rehabilitation and remediation efforts.[1]

---

[1] In connection with a DPA, once a defendant has made an appearance and the speedy trial clock has begun to run, as it has here, the Court has the authority to determine whether to grant or deny a speedy trial waiver pursuant to 18 U.S.C. § 3161(h)(2), and in cases where a defendant successfully fulfills the terms of a DPA, the Court must determine whether to grant leave for the dismissal of charges pursuant to Fed.R.Crim.P. 48(a).  At the December 20, 2012 status conference, the government did not object to the Court's characterization of the DPA as falling within the parameters of Federal Rule of Criminal Procedure 11(c)(1)(A).  After a subsequent, more careful review of the rule and the law, however, the government respectfully submits that the DPA does not fall within that rule.  Rule 11(c)(1)(A) applies in cases where a defendant pleads guilty to a charged offense (or a lesser-included offense) and the plea agreement provides that the government will not bring, or will move to dismiss, other criminal charges.  In the instant case, the defendants have not agreed to plead guilty.  Rather, the defendants entered pleas of not guilty, and they have entered into an agreement to defer prosecution altogether.  Given the Court's authority and role pursuant to 18

I.    BACKGROUND

On December 11, 2012, a criminal Information was filed charging HSBC Bank USA, N.A. ("HSBC Bank USA")[2] with violations of the Bank Secrecy Act ("BSA"), Title 31, United States Code, Section 5311 et seq., namely: willfully failing to maintain an effective anti-money laundering ("AML") program in violation of 31 U.S.C. § 5318(h)[3] and willfully failing to conduct and maintain due diligence on correspondent bank accounts held on behalf of foreign persons in violation of 31 U.S.C. § 5318(i).[4]  Congress originally enacted the BSA in 1970 to address an increase in criminal money laundering activity through financial institutions and, in 2001, as part of the USA PATRIOT Act, Congress amended the BSA to require domestic financial institutions to establish and maintain effective AML programs.[5]  The amendment was meant to "ensure that financial institutions of all sizes implement programs to combat their vulnerabilities to those who seek to use

---

U.S.C. § 3161(h)(2) and Rule 48(a), however, the government's submission responds to the requests that the Court articulated at the December 20, 2012 status conference.

[2] HSBC Bank USA is a federally charted banking institution and subsidiary of HSBC North America Holdings, Inc. ("HSBC North America").  HSBC North America is an indirect subsidiary of HSBC Holdings plc.

[3] Information at ¶¶ 18-20.

[4] Information at ¶¶ 21-23.

[5] 31 U.S.C. § 5318(h).

them to transfer or launder illegal funds."[6]  "Willful" failures
to establish or maintain an effective AML program are subject to
criminal penalties.[7]

   The criminal Information also charges HSBC Holdings plc
("HSBC Holdings")[8] with willfully facilitating financial
transactions on behalf of sanctioned entities in violation of the
International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C.
§§ 1702 and 1705,[9] and the Trading with the Enemy Act ("TWEA"), 50
U.S.C. App. §§ 3, 5, and 16.[10]  IEEPA makes it a crime to
willfully violate regulations issued under the Act restricting
financial transactions with Iran, Libya, Sudan, and Burma.[11]  TWEA
prohibits virtually all financial and commercial dealings with
Cuba, Cuban businesses, and Cuban assets.[12]

---

[6] 147 Cong. Rec. H7159-03 (2001).

[7] 31 U.S.C. § 5322.

[8] HSBC Holdings is the ultimate parent company of one of the world's largest banking
and financial services groups with approximately 6,900 offices in over 80 countries
(collectively, HSBC Holdings and its subsidiaries are the "HSBC Group").  HSBC Group is
comprised of financial institutions throughout the world ("HSBC Group Affiliates" or
"Affiliates") that are owned by various intermediate holdings companies and ultimately,
but indirectly, by HSBC Holdings, which is incorporated and headquartered in the United
Kingdom.

[9] Information at ¶¶ 24-25.

[10] Information at ¶¶ 26-27.

[11] 50 U.S.C. § 1705.

[12] 50 U.S.C. App. §§ 1-44.

On the day that the Information was filed, the DPA, a
Statement of Facts, and a Corporate Compliance Monitor agreement
were also filed with the Court.  The government also submitted a
letter requesting that the Court place this matter into abeyance
for sixty months pursuant to the terms of the DPA and exclude
that time from the period within which trial ordinarily must
commence pursuant to the Speedy Trial Act, 18 U.S.C.
§ 3161(h)(2).

## II.  THE DEFENDANTS' OFFENSE CONDUCT

As described in detail in the Statement of Facts to which
the defendants stipulated, from 2006 to 2010, HSBC Bank USA
failed to maintain an effective AML program.  HSBC Bank USA
failed to conduct adequate due diligence on certain customers,
did not adequately monitor bulk cash or electronic transactions
from these customers, and failed to provide the staffing and
other resources necessary to address these issues.  These serious
failures are discussed at length in the Statement of Facts.[13]

At the same time, Grupo Financiero HSBC, S.A. de C.V. ("HSBC
Mexico"), an HSBC Group Affiliate and one of the customers as to
which HSBC Bank USA failed to conduct due diligence, had its own

---

[13] Statement of Facts at ¶¶ 8-28.

significant AML failures.[14]  HSBC Holdings was aware of HSBC
Mexico's AML weaknesses as early as 2002.  Despite this, no one
at HSBC Mexico or HSBC Holdings contacted HSBC Bank USA to
explain the significance of the problems in Mexico or their
potential harmful effect on HSBC Bank USA's business.  As a
result of this collective failure, Mexican and Colombian drug
traffickers were able to launder hundreds of millions of dollars
in drug trafficking proceeds from Mexico through the United
States without being detected by HSBC.

Additionally, from the mid-1990s through at least September
2006, HSBC Group Affiliates illegally moved or permitted to be
moved hundreds of millions of dollars through the U.S. financial
system on behalf of banks and other entities located in Cuba,
Iran, Libya, Sudan, and Burma.  To ensure these transactions were
not detected in the United States, HSBC Group Affiliates altered
and routed payment messages in a manner that hid the identities
of the sanctioned entities from HSBC Bank USA and other U.S.
financial institutions.

The causes of the failures in the defendants' AML and
sanctions programs were systemic.  First, there was a lack of

---

[14] Statement of Facts at ¶¶ 29-40.

6

accountability within the organization as to who was ultimately responsible for the AML and sanctions programs.  At the HSBC Holdings level, HSBC Group Compliance lacked the authority to mandate corrective or other action by any HSBC Group Affiliate. Instead, Group Compliance was left to make recommendations to the Affiliate's CEO or compliance staff.  At the Affiliate level, HSBC's internal policies about whether AML officers or business executives were ultimately responsible for the AML and sanctions programs were unclear.  As a result of the institution-wide lack of accountability and diffusion of responsibility, AML compliance problems often went unresolved.

Second, the AML program was viewed as an area where resources could be cut to increase profits.[15]  For example, in 2007, HSBC North America's Regional Compliance Officer, the top compliance officer in North America who oversaw the AML program at HSBC Bank USA, left and was not replaced.  Instead, HSBC North America's General Counsel was asked to assume the role in addition to her other responsibilities, and was unable to adequately monitor AML compliance performance while performing these dual functions.  Further, in 2008, HSBC Bank USA hired an

---

[15] Statement of Facts at ¶¶ 25-28.

unqualified Head of Compliance/AML to report directly to the General Counsel/Regional Compliance Officer.

As set out in the Statement of Facts, HSBC Bank USA's entire AML program suffered from a lack of resources.  In March 2008, HSBC Bank USA's Chief Operating Officer for Compliance conducted an internal review of the AML program and found it to be "behind the times" and in need of fundamental change to meet regulators' expectations and to achieve parity with other banks.  At the time, HSBC Bank USA had only four employees to review suspicious wire transactions.  In contrast, following the remedial measures undertaken by HSBC, HSBC Bank USA now has roughly 430 employees reviewing suspicious wire transactions.  In total, HSBC Bank USA has increased its AML staffing from 92 full-time employees and 25 consultants in January 2010, to approximately 880 full-time employees and 267 consultants as of May 2012.

Third, the bank's compliance structure and corporate culture discouraged sharing of information within the organization.  For example, HSBC Bank USA had a policy not to conduct due diligence on other HSBC Group Affiliates – a policy that ultimately impeded the bank's ability to assess its money laundering vulnerabilities, including the extensive AML problems at HSBC

8

Mexico.[16]  At the HSBC Holdings level, the former Head of Group Compliance adopted the approach that HSBC did not "air the dirty linen of one affiliate with another."[17]  As a result, no one at HSBC Mexico or HSBC Holdings told HSBC Bank USA about HSBC Mexico's AML problems or their potential effect on HSBC Bank USA's AML program.[18]  With respect to U.S. sanctions, despite HSBC Bank USA's request for full details in transactions processed by HSBC Group Affiliates, some Group Affiliates structured transactions so that HSBC Bank USA could not see the originator or beneficiary of the transactions.  As a result, HSBC Bank USA could not properly review the transactions to determine whether they violated U.S. sanctions.[19]

## III. THE DEFERRED PROSECUTION AGREEMENT SERVES THE ENDS OF JUSTICE

The resolution of the government's investigation through this DPA came after more than four years of investigation and reflects a careful weighing of the factors that the government must consider in determining the appropriate disposition in cases involving wrongdoing by business entities:  (1) the nature and

---

[16] Statement of Facts at ¶ 15.

[17] Statement of Facts at ¶ 45.

[18] Statement of Facts at ¶¶ 42-45.

[19] Statement of Facts at ¶¶ 65-67.

seriousness of the offense; (2) the pervasiveness of the wrongdoing within the corporation; (3) the corporation's history of similar misconduct; (4) the corporation's timely and voluntarily disclosure of wrongdoing and its willingness to cooperate in the investigation; (5) the existence and effectiveness of the corporation's pre-existing compliance program; (6) the corporation's remedial actions; (7) collateral consequences, including whether there is a disproportionate harm to shareholders, pension holders, employees, and others not proven personally culpable, as well as the impact on the public arising from the prosecution; (8) the adequacy of the prosecution of individuals responsible for the corporation's malfeasance; and (9) the adequacy of remedies such as civil or regulatory enforcement actions.[20]

As discussed in greater detail above, and as admitted by the defendants in the Statement of Facts, the failures in the defendants' AML and sanctions programs were both serious and systemic.  The defendants, however, were also exceptionally cooperative with the government's investigation, have already implemented numerous changes to their culture of compliance to ensure such failures to do not occur again, and have clearly and

---

[20] U.S. Attorney's Manual § 9-28.300.

repeatedly exhibited a commitment to taking further action in this regard.

The DPA in this case was carefully tailored to punish the defendants and deter future misconduct by others – including by requiring the defendants to forfeit $1.256 billion, the largest ever forfeiture in a bank prosecution – while still affording the defendants the ability, through a five-year DPA period, to permanently fix their systemic shortcomings under the watchful eyes of a monitor and with the knowledge that any breach in the terms of the DPA will have significant consequences.  The DPA also avoids the potential collateral consequences – such as loss of jobs to employees that had no culpability for HSBC's conduct – that could otherwise have resulted from a guilty plea.  In essence, the DPA ensures many of the same punitive effects of a guilty plea (including requiring the payment of an enormous forfeiture judgment and an admission of all wrongdoing by the defendant entities) while, at the same time, ensuring that the defendant entities rehabilitate themselves under the supervision and monitoring of the government over a five-year period.

Notably, long before any charging decisions were made, the defendants had already voluntarily undertaken significant remedial measures to address the problems in their AML and

11

sanctions compliance programs.  The defendants replaced virtually all of the senior executives who oversaw these programs at HSBC Bank USA and HSBC Holdings.[21]  HSBC Bank USA also "clawed back" bonuses for its most senior executives who oversaw their AML program, including the CEO, Chief Compliance Officer, and AML Director.[22]

Additionally, the defendants took many steps to address the lack of accountability over their AML and sanctions compliance programs.  HSBC Holdings simplified its control and reporting structures for the entire organization to better understand and address AML risks worldwide.[23]  HSBC Holdings elevated the new Head of Group Compliance to the status of a general manager, which is one of the 50 most senior positions at HSBC worldwide.[24] The Head of Group Compliance now also directly oversees and is accountable for every compliance and AML officer globally.[25]  HSBC Holdings restructured its executive bonus system so that any executive's bonus is dependent upon that executive meeting

---

[21] DPA at ¶¶ 5a, 5m, 5q, and 5s.

[22] DPA at ¶ 5b.

[23] DPA at ¶ 5n.

[24] DPA at ¶ 5q.

[25] DPA at ¶ 5r.

compliance and AML standards.[26]  Furthermore, HSBC Holdings now requires its senior executives to defer a portion of their bonus compensation until HSBC Holdings has met all of the requirements of its resolution with the government in this case.[27]

HSBC Bank USA also reorganized its AML department to elevate its status within the institution.[28]  Additionally, HSBC Bank USA separated the Legal and Compliance Departments so that the AML Director is now required to report directly to the Board of Directors and senior management about HSBC Bank USA's AML program.[29]  As discussed above, HSBC Bank USA also significantly increased staffing in AML, and its spending on AML is nine times what it was in 2009.[30]

The defendants also took numerous steps to address the sharing of information within the organization.  HSBC Holdings implemented procedures that require the sharing of information pertaining to AML weaknesses at one Group Affiliate horizontally

---

[26] DPA at ¶ 5v.

[27] DPA at ¶ 5x.

[28] DPA at ¶ 5e.

[29] DPA at ¶ 5e.

[30] DPA at ¶¶ 5c and 5d.

throughout the HSBC Group.[31]  If an executive believes that an AML issue in his or her area of responsibility might impact other areas of the organization, that executive is personally responsible for seeking out the executives in other areas of the organization potentially affected and making them aware of the issues.[32]

The DPA also reflects that, upon learning of the government's investigation, the defendants accepted responsibility and fully cooperated.  The defendants conducted their own internal investigations at HSBC Bank USA, HSBC Holdings, and other HSBC Group Affiliates.  As part of their internal investigations, the defendants conducted over 100 interviews and provided detailed summaries and documents used during those interviews to the government.  The defendants also voluntarily produced thousands of documents created and stored outside of the United States that otherwise would have been outside the subpoena power of the grand jury.  This included assisting in the production of documents requested pursuant to international treaties, which allowed the government to obtain

---

[31] DPA at ¶ 5t.

[32] DPA at ¶ 5u.

and review these documents in significantly less time than otherwise would have been the case.

Given the seriousness of the defendants' offense conduct, and in an effort to deter other financial institutions from committing similar violations in the future, the DPA includes a number of stringent conditions that have not traditionally been required in prior BSA or sanctions violations investigations that were resolved through a DPA.  First, the five-year term of this DPA is amongst the longest that has ever been imposed on a financial institution for AML or sanctions violations, reflecting the seriousness of the defendants' conduct and the need for a long period during which the defendants will be closely monitored by the government.  Indeed, only one other DPA in a BSA or sanctions violation case has included a five-year term.[33]  While the remediation efforts taken by the defendants to date have been significant, the widespread systemic problems described above will take time to fully correct.  The five-year term of the DPA, during which time the government will be closely monitoring the defendants' remedial efforts, is long enough to ensure that those

---

[33] Only MoneyGram International, Inc. (MDPA 12-cr-0291-JCC), a money services business, had a similar five-year term.

changes are made effectively and are made in a way that will be sustained for the long term.

Second, despite the fact that the BSA applies only to domestic United States financial institutions, the DPA not only requires the defendants to have an effective AML program in the United States, but also mandates specific policies and actions to enhance the AML standards at HSBC Group Affiliates around the world.  This provision of the DPA represents a significant benchmark for future AML compliance and enforcement by requiring HSBC Holdings to go beyond the requirements of the BSA and by requiring that all HSBC Group Affiliates follow the highest or most effective AML standards available in any locations where the HSBC Group operates.[34]  That means, at a minimum, all HSBC Group Affiliates worldwide must adhere to U.S. AML standards.[35]

Third, prior DPAs in the AML and sanctions context have not required corporate compliance monitors, because a financial institution's domestic regulators are usually in a position to ensure the institution takes the necessary steps to be compliant with the law.  In this case, however, because the criminal conduct occurred at a number of Affiliates in different

---

[34] DPA at ¶ 5p.

[35] DPA at ¶ 5p.

countries, the government has required a compliance monitor (who will be reporting regularly to the Department of Justice and relevant regulators) to oversee and supervise the changes HSBC is making throughout the world and to provide the regulators in the various countries another level of support.

Fourth, the $1.256 billion forfeiture is the largest ever imposed on a financial institution.  The forfeiture, moreover, is based on the amount of drug trafficking proceeds and sanctioned entity transactions that moved through HSBC, and not the revenue that HSBC earned from these transactions.  (The revenue HSBC earned from these transactions is a small fraction of $1.256 billion.)

These strict conditions, and the unprecedented forfeiture and penalties imposed, serve as a significant deterrent against future similar conduct.  Additionally, these conditions ensure that the changes that the defendants have pledged to make in their compliance structure and culture will be implemented effectively and under the supervision of the government, regulators and the monitor.

For the foregoing reasons, the government submits that the DPA adequately reflects the serious nature of the defendants'

offense conduct and justly punishes them, while at the same time
providing for the rehabilitation of the defendants, the avoidance
of significant potential collateral consequences, and the
deterrence of others who might be tempted to engage in the same
conduct.

## IV.   THE SELECTION OF THE MONITOR

The DPA requires HSBC Holdings to retain an independent
compliance monitor to oversee its compliance with the terms of
the DPA.[36]   At the December 20th status conference, the Court asked
the government to address "the acceptability of a monitor, the
selection of whom doesn't involve judicial participation."[37]   In
accordance with the terms of the DPA, HSBC Holdings submitted the
names of three potential monitor candidates to the government on
January 11, 2013.

The process for selecting a monitor within the Department of
Justice is well-established and follows a set of strict
guidelines involving multiple levels of review within the
Department.[38]   This process is designed to:  (1) select a highly

---

[36] DPA at ¶¶ 9-13.

[37] Trans. at 7.

[38] U.S. Attorney's Manual, Criminal Resource Manual § 9-163.

qualified and respected person or entity based on suitability for
the assignment and all of the circumstances; (2) ensure avoidance
of potential and actual conflicts of interest; and (3) otherwise
instill public confidence in the selection process.  Per the
standard terms of DPAs, the courts do not take a role in the
monitor selection process.

In addition to the monitor requirement in the DPA, the Board
of Governors of the Federal Reserve System ("Federal Reserve") in
the United States and the Financial Services Authority ("FSA") in
the United Kingdom have imposed similar monitor requirements as
part of their own agreements with HSBC Holdings.  While the
Department of Justice has sole discretion in selecting the
monitor under the DPA, the government will seek input from the
Federal Reserve and FSA.

## CONCLUSION

For the aforementioned reasons, the government respectfully submits that the DPA serves the ends of justice.  Furthermore, the government requests that the Court place this matter into abeyance for a period of sixty months, pursuant to the terms of the DPA, and exclude that time from the period within which trial must commence, pursuant to the Court's authority under 18 U.S.C. § 3161(h)(2).

Date: January 30, 2013

LANNY BREUER
ASSISTANT ATTORNEY GENERAL

LORETTA E. LYNCH
UNITED STATES ATTORNEY
Eastern District of New York

By: Alexander A. Solomon
Daniel S. Silver
Assistant U.S. Attorneys

JAIKUMAR RAMASWAMY
Chief, Asset Forfeiture and
Money Laundering Section
Criminal Division
United States Department of Justice

By: Joseph K. Markel
Craig M. Timm
Trial Attorneys
Asset Forfeiture and
Money Laundering Section