CAHILL GORDON & REINDEL LLP
EIGHTY PINE STREET
NEW YORK, NY 10005-1702

TELEPHONE: (212) 701-3000
FACSIMILE: (212) 269-5420

SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

January 30, 2013

**By ECF**

The Honorable John Gleeson
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Chambers 727 S
Brooklyn, New York 11201

Re:   United States v. HSBC Bank USA, N.A. and HSBC Holdings plc,
      12 Cr. 763 (JG)

Dear Judge Gleeson:

HSBC Holdings plc[1] and HSBC Bank USA, N.A. (collectively, "HSBC") respectfully submit this letter in response to the Court's questions at the December 20, 2012 conference regarding the Deferred Prosecution Agreement between HSBC and the government (the "Agreement"). For the reasons set forth below, HSBC respectfully submits that the Court should grant the parties' joint request to exclude time under the Speedy Trial Act for the term of the Agreement, and that in all events, the government should be held to its obligations under the Agreement.

1.       **The Speedy Trial Act Governs The Court's Review of The Agreement, And Rule 11 Does Not Apply.**

This matter came before the Court on the application of the parties for the exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(2), for the duration of the five-year period of the Agreement. *See* Letter of the Government, dated December 11, 2012. At the December 20 conference, the Court inquired about the applicability of Federal Rule of Criminal Procedure 11(c)(1)(A) and United States Sentencing Guidelines ("U.S.S.G.") Section

---

[1]       HSBC Holdings is the ultimate parent company of a banking and financial services group with approximately 6,900 offices in over 80 countries (collectively, HSBC Holdings and its subsidiaries are the "HSBC Group").

6B1.2.   Those provisions do not apply in the context of a deferred prosecution agreement because Rule 11(c)(1) – which triggers the application of Guidelines Section 6B1.2 – is limited by its terms to cases where "the defendant *pleads guilty or nolo contendere* to either a charged offense or a lesser or related offense." Fed. R. Crim. P. 11(c)(1) (emphasis added).  That is not the case here.  Rather, the Agreement provides that, if HSBC meets its obligations, "the Department shall seek dismissal with prejudice of the criminal Information filed against the HSBC Parties." (Agreement, ¶ 15).  If the Information ultimately is dismissed pursuant to the Agreement, with prejudice, there will no longer be any charges to which HSBC could plead guilty. *Cf. United States v. Wellington,* 417 F.3d 284, 290 (2d Cir. 2005) ("With respect to defendant's claim that the District Court erred by not fulfilling the requirements of Rule 11 … it bears underscoring that we have never held that Rule 11 procedures are required in circumstances other than when a defendant enters a plea of guilty or *nolo contendere*").  Until such time, the Information will be pending, but the charges deferred, with no accompanying guilty or *nolo contendere* plea by HSBC that would trigger Rule 11(c)(1).

The Speedy Trial Act rather than Rule 11(c)(1) provides the applicable legal standard for the Court's review, as it requires the Court's approval for the exclusion of time. Title 18, United States Code, Section 3161(h)(2) provides that "[a]ny period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct" "shall be excluded . . . in computing the time within which the trial of any such offense must commence."  While subsection (h)(2) does not itself set forth a standard for the exclusion of time in the deferred prosecution context, subsection (h)(7), the Act's catch-all provision, provides that time should be excluded if the interests of justice served by the exclusion outweigh the best interests of the defendant and the public in a speedy trial.  18 U.S.C. § 3161(h)(7); *see United States v. Wright Medical Tech., Inc.,* No. 10-8233, 2010 WL 6606785 at *1 (D.N.J. Sept. 30, 2010) (granting exclusion under both subsections (h)(2) and (h)(7) under the subsection (h)(7) standard).

### 2.      The Exclusion Of Time Under Section 3161(h)(2) Is Justified.

Providing HSBC the time to complete its substantial remediation and ongoing cooperation obligations under the Agreement is in the interests of justice, and warrants the exclusion of time under Section 3161(h)(2).

Most significantly, the Agreement requires HSBC to continue an extensive remediation of its anti-money-laundering ("AML") and sanctions compliance functions that HSBC commenced long before the Agreement was executed.  These remediation efforts, which are spelled out in detail in the Agreement, represent an investment by HSBC of over $290 million to date, and go to the heart of the sanctions and AML compliance issues on which the government's investigation and HSBC's internal investigation focused.  (Agreement, ¶ 5(a)-(z)). As part of this remediation program, management in the United States and at HSBC Holdings has been changed.  By the end of 2010, HSBC installed a new U.S. senior management team, including a new U.S. CEO, General Counsel, Head of Compliance, and AML Director. Meanwhile, at HSBC Holdings, there was a transition to a new CEO, Stuart Gulliver, and a new Chairman, Douglas Flint.  In addition, HSBC has brought in Stuart Levey from the U.S. Treasury

Department as Global Chief Legal Officer, Preeta Bansal, a former senior lawyer in the White House and Solicitor General of the State of New York as Global General Counsel for Litigation and Regulatory Affairs, and Bob Werner, the former Director of both the Financial Crimes Enforcement Network ("FinCEN") and the Office of Foreign Assets Control ("OFAC") as Head of Group Financial Crime Compliance and Group Money Laundering Reporting Officer ("MLRO"). The new leadership team recognized that immediate action was required and has undertaken an aggressive plan to address the past deficiencies identified in the Agreement.

HSBC Bank USA and its parent, HSBC North America Holdings, Inc. ("HNAH"), have "clawed back" deferred compensation from several senior officers. With the assistance of industry-leading consultants, HSBC Bank USA has redeveloped its AML policies, in particular with respect to know your customer ("KYC"), customer risk-rating and country risk-rating. A HNAH-wide KYC remediation project has been completed and HSBC Bank USA has implemented a new AML monitoring system to replace the system that contributed to the AML failures identified in the investigation. HSBC Bank USA now conducts KYC on affiliates and has exited the Global Banknotes business. HSBC Bank USA today spends nine times more on AML than it did in 2009. HSBC Bank USA has increased its AML and sanctions compliance staffing from 92 full-time employees ("FTEs") and 25 consultants as of January 2010, to 880 FTEs and 267 consultants as of May 2012.

On a global level, HSBC Holdings' remediation has included a dramatic structural overhaul of the entire organization, in order to eliminate restrictions on the flow of information within the bounds of local law, to increase accountability at the highest levels, and to exit countries and business lines that do not meet HSBC's new compliance culture and approach. In addition, HSBC has exited two businesses – Global Banknotes and HSBC Mexico S.A.'s ("HBMX") Cayman accounts – that were a focus of the government's investigation. HSBC Bank USA has exited approximately 109 correspondent relationships for risk reasons. Moreover, HSBC has begun an effort to adhere to a standard globally on many of these control issues that is shaped by the highest or most effective AML standards applicable in any location where the HSBC Group operates. This will require, at a minimum, adhering to U.S. AML standards. During a 2012 hearing before the Permanent Subcommittee on Investigations of the United States Senate ("PSI") the PSI was highly complimentary of these steps, noting that they "could represent a groundbreaking approach for the bank if it, in fact, pushes its affiliates toward uniform and high compliance standards." (Report of the PSI, dated July 17, 2012 ("PSI Report"), at 34). The Head of HSBC Group Compliance and Group MLRO now have direct oversight of the compliance function globally, and the sharing of compliance-related information across the HSBC Group has dramatically improved. HSBC Group has begun remediating KYC across all affiliates at an estimated total cost of an additional $700 million over five years. HSBC Group has also overseen extensive improvements in the control environment at HBMX, including a large-scale KYC remediation and a complete overhaul of HBMX's cash handling controls.

HSBC also has strengthened its sanctions compliance program. HSBC will soon apply key OFAC and other sanctions lists to its monitoring of transactions in all currencies and in all jurisdictions. HSBC Bank USA has implemented new training programs to ensure consistency of approach across affiliates, including Group-sponsored OFAC training. To

promote these efforts, HNAH and HSBC Bank USA have hired sanctions compliance personnel directly from OFAC, including a new Deputy Director of HNAH's Global Sanctions Program. To reduce operator errors, HSBC Bank USA hired new personnel, enhanced its training procedures, and consolidated its review teams into centralized groups responsible for reviewing all types of transactions. HSBC Bank USA also has enhanced its filtering technology.

The Agreement, and HSBC's commitment to continuing its extensive remedial efforts, will ensure that HSBC's past failures do not recur. This is particularly so in light of the five-year monitorship imposed by the Agreement, the selection process for which is already well underway. The Monitor is required to evaluate HSBC's ongoing compliance with Bank Secrecy Act and OFAC requirements on a regular basis, and to report to the government on that compliance, as well as on any violations. (Agreement, Attachment B, ¶¶ 3, 8). The Monitor is also required to make recommendations regarding the improvement of HSBC's compliance and controls, and HSBC is required to implement any recommendations that the government requires. (Agreement, Attachment B, ¶ 5).

Beyond continuing its remediation efforts, HSBC has also agreed to "continue to cooperate fully with the [government] in any and all investigations"—a requirement that has no limitation based on the subject matter of the investigation. (Agreement, ¶ 6). The Agreement further requires HSBC to make witnesses, information and documents available "concerning any and all investigation[s]," and provide "information, materials, documents, databases, or transaction data . . . wherever located," should the government request it in connection with the investigation or prosecution of any current or former officers, directors, employees, agents or consultants. (Agreement, ¶ 6(a)-(b)). HSBC has already begun cooperating with requests made by the government under these provisions.

HSBC's cooperation under the Agreement is a continuation of its approach from the outset of the government's investigation. Prior to the filing of the Information, HSBC produced over 9.4 million pages of documents from U.S. and foreign affiliates, going to great lengths to navigate foreign data privacy and bank secrecy restrictions to do so. HSBC also conducted an extensive internal investigation, including interviewing over 70 current and former HSBC employees. HSBC strongly encouraged its current and former employees to cooperate with the investigation and to be interviewed by the government, even when those employees were located in foreign jurisdictions. In addition, HSBC engaged a highly reputable international consulting firm, Deloitte LLP, to conduct a detailed review of HSBC's worldwide sanctions compliance. HSBC made the results of that review – which involved an analysis of more than 180 million SWIFT messages – available to the government. The Statement of Facts acknowledges that in addition to assisting the government in its investigation of HSBC, this cooperation has "assisted the Government in investigations of certain individuals suspected of money laundering and terrorist financing." (Agreement, Attachment A (Statement of Facts), ¶ 79). Without this level of cooperation, the government would have been left to conduct its own extensive, lengthy, and expensive investigation that may well have been impeded by various difficult, and quite possibly insurmountable, jurisdictional and cross-border obstacles.

HSBC's cooperation was not limited to the government's investigation in this case. HSBC also provided extraordinary cooperation in the respective companion investigations

-4-

of (i) the New York County District Attorney's Office; (ii) the PSI; (iii) the U.K. Financial Services Authority ("FSA"); (iv) the Board of Governors of the U.S. Federal Reserve System; (v) OFAC; (vi) the Office of the Comptroller of the Currency (the "OCC"); and (vii) FinCEN. For example, the PSI noted that "HSBC was fully cooperative with the inquiry, producing documentation and witnesses from around the world, including documents for which it could have claimed privilege." (PSI Report at 3). And Senator Tom Coburn, Ranking Minority Member of the PSI, publicly thanked HSBC for its cooperation, noting that "in the years that I've been on this subcommittee and this committee, which is eight now, I've never seen the type of cooperation that we got both from a government agency [the OCC] and a private entity [HSBC]."

All of the foregoing makes clear that the Agreement serves the interests of justice, and the public's interest, by addressing directly the past failures on which the government's investigation focused, and ensuring that HSBC continues its good corporate citizenship. Accordingly, the Agreement provides an appropriate basis for the exclusion of time under Section 3161(h)(2), and time should be excluded for the term of the Agreement.

### 3.  In All Events, The Government Is Required To Perform Its Obligations Under The Agreement.

Regardless of the Court's determination on the Speedy Trial Act issue or its interpretation of Rule 11(c), HSBC respectfully submits that the government must be held to its obligations under the Agreement. *Cf. Santobello v. New York*, 404 U.S. 257, 262 (1971) ("[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."); *United States v. Garcia*, 519 F.2d 1343, 1345 (9th Cir. 1975) (holding, in context of a deferred prosecution agreement, that "when the prosecution makes a 'deal' within its authority and the defendant relies on it in good faith, the court will not let the defendant be prejudiced as a result of that reliance") (quoting *United States v. Goodrich*, 493 F.2d 390, 393 (9th Cir. 1974)). Indeed, the Second Circuit has recognized that where the government makes an agreement concerning immunity from prosecution, due process requires that the agreement be honored. *See United States v. Aleman*, 286 F.3d 86, 90 (2d Cir. 2002) (in context of agreement not to prosecute: "Due process . . . requires that the government adhere to the terms of any plea bargain or immunity agreement it makes") (quoting *United States v. Pelletier*, 898 F.2d 297, 302 (2d Cir. 1990)) (internal quotation marks omitted).

HSBC is plainly entitled to its essential contractual right – the deferral of prosecution – because it gave up substantial rights in reliance on the Agreement. *See Garcia*, 519 F.2d at 1345. Most importantly, HSBC publicly admitted to the conduct set forth in the Information and the Statement of Facts, which caused HSBC to suffer unusual reputational harm. HSBC has been pilloried in the press for the conduct contained in these admissions, and now faces a long process of restoring public faith and confidence. The Agreement effectively tied HSBC's hands from defending itself against attacks in the press, because the Agreement would view any public statement that contradicts the Statement of Facts or Information as a breach, and because the Agreement would require that the government approve any press release responding to such attacks. (*See* Agreement, ¶¶ 21, 22). HSBC agreed to these restrictions, and the

prejudice it knew would follow, only because it was part of the heavy price of deferral and ultimate dismissal of the prosecution.

Civil litigants likely would also attempt to use HSBC's admissions against it in any unrelated civil proceedings that may be brought. Significantly, this prejudice in other litigation, and the reputational harm caused by the admissions, cannot be undone by the Court or the government. HSBC agreed to suffer this prejudice only because it relied on the Agreement as a means to bring closure to this matter. As Chief Judge Mishler stated, "if a promise was made to a defendant by the government . . . and the defendant relied upon it in incriminating himself . . . the government should be held to abide by its terms." *United States v. Lieber*, 473 F. Supp. 884, 890 (E.D.N.Y. 1979) (Mishler, C.J.) (quoting *United States v. Carter*, 454 F.2d 426, 427-28 (4th Cir. 1972)) (internal quotation marks omitted).

HSBC paid forfeiture and civil penalties to U.S. authorities totaling over $1.9 billion, and waived other rights in the Agreement, including its rights under the applicable statutes of limitations, the Speedy Trial Act and the Grand Jury Clause of the Fifth Amendment. (Agreement, ¶ 1 (waiver of indictment and consent to filing of Information, and waiver of speedy trial rights), ¶ 16 (tolling of limitations period)). HSBC waived these rights only because the Agreement obligates the government to defer prosecution of the filed charges, and dismiss them upon HSBC's successful completion of the Agreement. Indeed, because the Information could not have been filed without HSBC's waiver of its Grand Jury rights, this proceeding itself rests on HSBC's reliance on the Agreement. HSBC having relied to its detriment on the government's promises in the Agreement, the law clearly requires that the government be held to those promises as long as HSBC performs its own obligations – which, as indicated, HSBC is doing. *See Lieber*, 473 F. Supp. at 894-95 ("We should also note that we are uncertain whether, in any event, a showing of 'prejudice' is required in a case such as this . . . . By living up to their bargains, the defendants here suffered to their detriment in exactly the manner required by the agreement. They are entitled to a remedy").

*          *          *

    For the foregoing reasons, HSBC respectfully submits that the Court should exclude time under the Speedy Trial Act for the duration of the five-year term of the Agreement, and that regardless of the Court's decision on the Speedy Trial Act exclusion or the Rule 11(c) issue, the Agreement should be given full force and effect by the Court.

    Respectfully,


/s/                                          /s/
David N. Kelley                              Samuel W. Seymour
Cahill Gordon & Reindel LLP                  Sullivan & Cromwell LLP


cc:  Joseph Markel (by ECF)
   Craig Timm (by ECF)
   Alex Solomon (by ECF)
   Daniel Silver (by ECF)