# SALON MARROW DYCKMAN NEWMAN & BROUDY LLP

ATTORNEYS AT LAW

LIVIU VOGEL*
Partner

lvogel@salonmarrow.com
direct dial (646) 843-1909

*also admitted in Connecticut

292 MADISON AVENUE • NEW YORK, NY 10017

Telephone (212) 661-7100

Facsimile (212) 661-3339

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAY 02 2013 ★

BROOKLYN OFFICE

One University Plaza, Suite 408
Hackensack, NJ 07601
Telephone (201) 662-0656
Facsimile (201) 487-9054

257 Lyons Plains Road
Weston, CT 06883
Telephone (203) 227-0023
Facsimile (646) 843-1910

800 Corporate Drive, Suite 208
Ft. Lauderdale, FL 33334
Telephone (954) 491-0099
Facsimile (954) 491-1544

May 2, 2013

VIA HAND DELIVERY

Hon. John Gleeson
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201



RECEIVED
MAY -2 2013
CHAMBERS OF JUDGE GLEESON

Re: *United States v. HSBC*, 12 CR 763 (JG)

Dear Judge Gleeson:

My firm represents the Marines killed and injured in the 1983 Beirut Marine barracks bombing attack and the family members of the Marines killed and injured in that terrorist attack. Our clients have secured judgments totaling over $4 billion in compensatory damages and $4.9 billion in punitive damages against the Islamic Republic of Iran and its Ministry of Information and Security in cases brought in the United States District Court for the District of Columbia. Since our clients obtained those judgments (beginning in 2007), we have actively pursued the collection of the amounts owed to them by Iran and its agencies and instrumentalities in litigation pending in the Southern District of New York and elsewhere. Our clients and hundreds of other victims of Iranian terrorism recently secured summary judgment in a matter pending before Judge Katherine B. Forrest in the Southern District. *See Peterson v. Islamic Republic of Iran*, 2013 U.S. Dist. LEXIS 40470 (S.D.N.Y. Feb. 28, 2013). That matter resulted in the turnover of in excess of $1.75 billion in Iranian funds to Iranian victims of terrorism. The plaintiff/judgment creditors in that action still have well in excess of $2 billion in unsatisfied compensatory damages judgments against Iran, as well as billions more in unsatisfied punitive damages awards.

The willingness of major banking institutions to perform services for Iran, while undertaking efforts to hide Iran's role in those banking transactions, has contributed significantly to our clients' inability to secure full payment on their judgments against Iran. While we recognize that the Information in this action refers to financial transactions with Iran that occurred in 2006 and earlier, a Congressional report (the "Congressional Report") concerning

SALON MARROW DYCKMAN NEWMAN & BROUDY LLP

Page 2

defendants HSBC Holdings plc and HSBC Bank USA N.A. ("HBUS" and, collectively with HSBC Holdings plc, "HSBC") indicates that HSBC continued to process what were known as "U-turn transactions" for Iran through 2007 and that HSBC entities located outside of the United States routinely hid Iran's participation in those transactions. *See* Exhibit A. The Congressional Report indicates that HBUS informed the parent entity of this misconduct by HSBC entities headquartered overseas. Nevertheless, both HBUS and the foreign HSBC affiliates continued to process these transactions on behalf of Iran for a number of years. *See, e.g.,* Congressional Report at p. 6. As stated in the Congressional Report:

> To avoid triggering the OFAC filter and an individualized review by HBUS, HBEU [*i.e.,* HSBC Europe] *systematically altered transaction information to strip out any reference to Iran* and characterized the transfers as between banks in approved jurisdictions. The affiliates' use of these practices, which even some within the bank viewed as deceptive, was repeatedly brought to the attention of HSBC Group Compliance, by HBUS compliance personnel and by HBEU personnel who objected to participating in the document alteration and twice announced deadlines to end the activity. Despite this information, HSBC Group Compliance did not take decisive action to stop the conduct or inform HBUS about the extent of the activity. At the same time, while some at HBUS claimed not to have known they were processing undisclosed Iranian transactions from HSBC affiliates, internal documents show key senior HBUS officials were informed as early as 2001. *In addition, HBUS' OFAC filter repeatedly stopped Iranian transactions that should have been disclosed to HBUS by HSBC affiliates, but were not.* Despite evidence of what was taking place, HBUS failed to get a full accounting of what its affiliates were doing or ensure all Iranian transactions sent by HSBC affiliates were stopped by the OFAC filter and reviewed to ensure they were OFAC compliant.

*Id.* (emphasis added).

The Congressional Report also demonstrates the massive size of HSBC's wrongdoing. As of the publication of the Congressional Report on July 17, 2012, HSBC's outside auditor had identified 25,000 disguised transactions involving Iran that were passed through HBUS. *Id.* The 25,000 Iranian transactions constituted the vast majority of the 28,000 HSBC transactions involving various terrorist states that the Congressional Report discusses. The Report further emphasizes that:

> The review has characterized nearly 2,600 of those transactions, including 79 involving Iran, and with total assets of more than $367 million, as "Transactions of Interest" requiring additional analysis to determine whether violations of U.S. law occurred. While the aim in many of those cases may have been to avoid the delays associated with the OFAC filter and individualized reviews, rather than to

**SALON MARROW DYCKMAN NEWMAN & BROUDY LLP**

Page 3

> facilitate prohibited transactions, actions taken by HSBC affiliates to circumvent OFAC safeguards may have facilitated transactions on behalf of terrorists, drug traffickers, or other wrongdoers. While HBUS insisted, when asked, that HSBC affiliates provide fully transparent transaction information, when it obtained evidence that some affiliates were acting to circumvent the OFAC filter, HBUS failed to take decisive action to confront those affiliates and put an end to the conduct. HBUS' experience demonstrates the strong measures that the U.S. affiliate of a global bank must take to prevent affiliates from circumventing OFAC prohibitions.

*Id.*

In addition, the Congressional Report demonstrates that HSBC's processing of Iranian transactions did not end in 2006, or even 2007. Rather, the report details a number of admittedly small, but nonetheless prohibited, transactions that HSBC undertook with Iran in 2008 and 2009. *See* Congressional Report at 165-66.

Our review of the public record in this action demonstrates that the United States has collected $1.9 billion in criminal forfeitures and civil penalties against HSBC as a result of HSBC's misconduct. We applaud the government for securing that payment, which should serve as a deterrent to HSBC and other financial institutions that have aided Iran in secreting its funds from our clients and other victims of terrorism.

Nevertheless, it is unfair that the many victims of Iranian terrorism will receive no direct benefit from the proposed non-prosecution agreement. Had HSBC and its banking peers been unwilling to hide Iran's participation in thousands of financial transactions, our clients' path to the collection of their judgments would have been a far easier one. Thus, on behalf of our clients, who have waited for decades to obtain some form of justice for the horrible losses that they suffered as a result of the Iranian-sponsored attack on the Beirut Marine barracks, we respectfully request that the Court consider whether the approval of the proposed non-prosecution agreement should be conditioned upon HSBC's payment of some portion of the criminal forfeiture to the thousands of victims of Iranian terrorism.

Respectfully,

Liviu Vogel

LV:rcj
cc: counsel of record via e-mail