

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DSS/CMT                                    *271 Cadman Plaza East*
F. #2009R02380                             *Brooklyn, New York 11201*

June 1, 2015

By ECF

The Honorable John Gleeson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re: United States v. HSBC Bank USA, N.A. and HSBC Holdings plc
            Criminal Docket No. 12-763 (JG)

Dear Judge Gleeson:

       The government respectfully submits this letter in support of its request to file the Monitor's "First Annual Follow-Up Review Report" (the "Monitor's Report" or "Report") with the Court under seal. A copy of the Monitor's Report will be submitted to the Court as a sealed appendix to this letter.

I.      Background

       On December 11, 2012, the government filed a criminal Information charging HSBC Bank USA, N.A. ("HSBC Bank USA")[1] with violations of the Bank Secrecy Act ("BSA"), Title 31, United States Code, Section 5311 et seq., namely: willfully failing to maintain an effective anti-money laundering ("AML") program in violation of 31 U.S.C. § 5318(h) and willfully failing to conduct and maintain adequate due diligence on correspondent bank accounts held on behalf of foreign entities in violation of 31 U.S.C. § 5318(i). The criminal Information also charged HSBC Holdings plc ("HSBC Holdings")[2]

---

[1] HSBC Bank USA is a federally chartered banking institution and subsidiary of HSBC North America Holdings, Inc. ("HSBC North America"). HSBC North America is an indirect subsidiary of HSBC Holdings plc.

[2] HSBC Holdings is the ultimate parent company of HSBC North America and is one of the world's largest banking and financial services groups (collectively, HSBC Holdings

with willfully facilitating financial transactions on behalf of sanctioned entities in violation of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1702 and 1705, and the Trading with the Enemy Act ("TWEA"), 50 U.S.C. App. §§ 3, 5, and 16.

On the day the Information was filed, a deferred prosecution agreement ("DPA"), statement of facts, and a corporate compliance monitor agreement were also filed with the Court.  The government also submitted a letter requesting that the Court place this matter in abeyance for sixty months pursuant to the terms of the DPA and exclude that time from the period within which trial ordinarily must commence pursuant to the Speedy Trial Act, 18 U.S.C. § 3161(h)(2).

The DPA imposes a number of stringent conditions on HSBC Group.  Perhaps most significantly, the DPA requires HSBC Group to implement enhanced AML standards globally.  Specifically, all HSBC Group Affiliates are required to follow the highest or most effective AML standards available in any location where HSBC Group operates.  Docket Entry 3-2 at ¶ 5.  That means, at a minimum, all HSBC Group Affiliates worldwide must adhere to U.S. AML standards.  Docket Entry 3-2 at ¶ 5.  As the Court itself noted, "the DPA imposes upon HSBC significant, and in some respects extraordinary, measures" and "it accomplishes a great deal."  Docket Entry 23 at 15, 20.  To oversee the implementation of these global standards and the other remedial measures, the DPA requires HSBC Holdings to retain an independent compliance monitor (the "Monitor").  Docket Entry 3-2 at ¶¶ 9-13.  The Monitor is required to provide annual reports to the government on HSBC's compliance with the terms of the DPA.  Docket Entry 3-4.  The Court has no role in the selection or removal of the Monitor.  Rather, the Monitor was selected by the Department of Justice from a pool of candidates proposed by HSBC and officially assumed his responsibilities on July 22, 2013.  See Docket Entry 3-2 at ¶ 9.  Since then, in accordance with the Court's July 1, 2013 Order, the government has filed quarterly reports with the Court regarding the implementation of the DPA.  In these reports, the government has carefully presented a high-level overview of the Monitor's annual findings in an effort to comply with the Court's order while avoiding revealing confidential details or otherwise inviting any of the negative consequences discussed below.

---

and its subsidiaries are the "HSBC Group").  HSBC Group is comprised of financial institutions throughout the world ("HSBC Group Affiliates" or "Affiliates") that are owned by various intermediate holding companies and ultimately, but indirectly, by HSBC Holdings, which is incorporated and headquartered in the United Kingdom.

In addition to serving as the Monitor under the DPA, the Monitor serves a similar role for the United Kingdom's Financial Conduct Authority ("FCA")[3] and the Board of Governors of the Federal Reserve System ("Federal Reserve").[4]  Because the Monitor serves multiple roles that involve similar and overlapping responsibilities, the Monitor's annual reports integrate information, analysis, and findings related to the work performed in all three capacities.

In January 2015, the Monitor issued his First Annual Follow-Up Review Report (the "Monitor's Report" or "Report") which set forth his findings and assessment of the then-current state of HSBC Group's AML and sanctions compliance program and of its progress over the course of the preceding year in improving its AML and sanctions compliance functions.  The Report was provided to the Department of Justice, FCA, and Federal Reserve, and the government provided a general overview of the Report's key findings in its court-ordered periodic update.  On April 28, 2015, the Court ordered the government to file the Monitor's Report with the Court.  The government submits this letter and the attached submissions from the Monitor, FCA, Federal Reserve, Hong Kong Monetary Authority,[5] and Bank Negara Malaysia in support of filing the Monitor's Report under seal.

II.   <u>Applicable Standards</u>

The public has a "general right to inspect and copy public records and documents, including judicial records and documents."  <u>Nixon v. Warner Communications, Inc.</u>, 435 U.S. 589, 597 (1978).  Similarly, under the First Amendment, the public has a "qualified … right to attend judicial proceedings and to access certain judicial documents." <u>Hartford Courant Co. v. Pellegrino</u>, 380 F.3d 83, 91 (2d Cir. 2004); <u>see</u> <u>also</u> <u>Press-Enterprise Co. v. Superior Court of Cal.</u>, 478 U.S. 1, 9 (1986).

In applying the common law right of access to determine whether an item can be filed under seal, a district court must (1) determine whether the item is a "judicial

---

[3] The FCA has a statutory objective to protect and enhance the integrity of the UK financial system.  In doing this, the FCA is focused on a number of priorities, including preventing the UK financial system from being used for a purpose connected with financial crime.

[4] The Federal Reserve is the consolidated supervisor of HSBC North America and the primary U.S. federal regulator of HSBC Holdings.

[5] The Hong Kong Monetary Authority has asked that we inform the Court that the views expressed in its letter are its own and were not made in coordination with any other parties.

document," (2) determine the weight of the presumption of access to any judicial document and (3) balance countervailing interests against the presumption of access.  Lugosch v. Pyramid Co., 435 F.3d 110, 119-20 (2d Cir. 2006).  The test for whether an item is a "judicial document" is not whether it is filed with the court, United States v. Amodeo, 44 F.3d 141, 145 (2d Cir. 1995) ("Amodeo I"), but rather whether the item is "relevant to the performance of the judicial function and useful in the judicial process."  Id.  The weight of the presumption of access to a judicial document, which falls along a "continuum," is determined by "the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts."  United States v. Amodeo, 71 F.3d 1044, 1049 (2d Cir. 1995) ("Amodeo II").

In assessing whether the public's qualified First Amendment right of access attaches to a particular document, courts in the Second Circuit have applied two approaches. The first is the "experience and logic" test, which assesses "whether the document[] ha[s] historically been open to the press and general public and whether public access plays a significant positive role in the functioning of the particular process in question."  Lugosch, 435 F.3d at 120 (internal quotation omitted).  The second approach considers the extent to which the document is derived from, or is a necessary corollary of, the capacity to attend the relevant proceedings.  Id.  Even where the First Amendment right applies to a document, it still may be sealed "if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and [the sealing] is narrowly tailored to serve that interest."  Id. (internal quotation marks omitted).  Thus, both the First Amendment and common law doctrines of public access entail a balancing of factors that may necessitate sealing of particular documents or records.

Countervailing factors that must be balanced against the common law and First Amendment rights of access are case-specific, but have been found to include the danger of impairing law enforcement activities and protecting the privacy interests of third parties.  Amodeo II, 71 F.3d at 1050-51.  In assessing the danger of impairing law enforcement activities, courts have considered the integrity of ongoing investigations, Amodeo I, 44 F.3d at 147, and the ability of law enforcement officers to secure current and future cooperation from persons desiring confidentiality, Amodeo II, 71 F.3d at 1050.

III.    Discussion

In this case, there is no common law or First Amendment right of access to the Monitor's Report.  Therefore, the Court need not conduct the balancing test described above. However, even if there was a right of access, it would be outweighed by the negative effect that public disclosure would have on the monitorship, the implementation of the DPA, global regulators' ability to supervise HSBC, the risk that criminals would use the Report to exploit

4

weaknesses in HSBC's and other financial institutions' AML and sanctions compliance programs, and the potential impact on monitors of other institutions.

                A.       Common Law Right of Access

        In order for the common law right of access to attach, the Court must conclude that the Monitor's Report is a "judicial document." See Lugosch, 435 F.3d at 119. To be a "judicial document" it must be "relevant to the performance of the judicial function and useful in the judicial process." Amodeo I, 44 F.3d at 145. As described in the government's January 30, 2013 Memorandum in Support of the DPA, the government maintains that the Court's authority in connection with the DPA is limited to approval of the exclusion of time under the Speedy Trial Act. However, in its July 1, 2013 Memorandum and Order, the Court found that it had limited authority to approve or reject the DPA and oversee the implementation of the DPA pursuant to its supervisory power. Docket Entry 23 at 6. Nonetheless, in approving the DPA, the Court noted that it was "as mindful of the limits of the supervisory power as I am of its existence." Docket Entry 23 at 13. The Court stated that its function during the term of the agreement is "to ensure that the implementation of the DPA remains within the bounds of lawfulness and respects the integrity of this Court." Docket Entry 23 at 20. The Court provided a non-exhaustive list of circumstances that would "warrant judicial intervention to protect the integrity of the Court," including cooperation requirements that would violate a company's attorney-client privilege, work product protections, or its employees' Fifth or Sixth Amendment rights, or a remediation requirement that would be unethical or create a conflict of interest. Docket Entry 23 at 11-12.

        The Monitor's Report had not even been written when the Court approved the DPA and excluded time under the Speedy Trial Act, so the Report could have played no role in the Court's decision. Rather, the Monitor's annual reports are progress reports for the government and for HSBC's regulators regarding HSBC's compliance with certain terms of the DPA and the efficacy of HSBC's AML and sanctions compliance programs. At their core, the reports are a tool to help the government determine whether HSBC has complied with the terms of the agreement or if HSBC has breached the agreement such as to warrant seeking an additional penalty or voiding the DPA and prosecuting HSBC. As the Court noted in its Memorandum and Order, "[t]he Executive Branch alone is vested with the power to decide whether or not to prosecute." Docket Entry 23 at 14. The Court highlighted that the exercise of prosecutorial discretion is "particularly ill-suited to judicial review." Docket Entry 23 at 14 quoting Wayte v. United States, 470 U.S. 598, 607 (1985). Therefore, even assuming the Court's stated limited supervisory power over the implementation of the DPA, the Monitor's Report is not relevant to this limited judicial function as it concerns none of the circumstances described in the Court's July 1, 2013 Order.

The Monitor's role is akin to that of the independent consultant in <u>S.E.C. v.</u> <u>American Intern. Group</u>. <u>See</u> 712 F.3d 1 (D.C. Cir. 2013). In that case, an independent consultant appointed pursuant to a consent agreement had no relationship with the court. <u>Id.</u> at 4. The court did not select or supervise the independent consultant and had no authority to extend the consultant's tenure or modify his authority. <u>Id.</u> The consent decree did not give the independent consultant any powers unique to an individual possessing judicial authority. <u>Id.</u> Especially important to the D.C. Circuit was that the independent consultant's reports could not "record, explain, or justify the court's decision in any way" to approve the consent decree. <u>Id.</u> Ultimately, for these reasons, the D.C. Circuit found that the independent consultant's reports were not judicial documents. <u>Id.</u> at 3-4. The same should be the finding here, where the Monitor's reports in no way impacted the decision of this Court to approve the DPA and toll the Speedy Trial clock; the Court had no role in selecting the Monitor or otherwise determining the content or focus of his reports; and the Court's limited, stated authority over the DPA is to ensure that the DPA remains within the bounds of lawfulness and respects the integrity of this Court.

In <u>Amodeo I</u>, the Second Circuit relied on a diametrically different set of material facts to hold that a Court Officer's report qualified as a judicial document. In <u>Amodeo I</u>, the question presented was whether a report generated by a Court Officer and already filed with the district court qualified as a judicial document. In that case, a consent decree provided for a Court Officer to be appointed and authorized that Officer to exercise a number of judicial powers including the authority to subpoena witnesses and documents and to take testimony under oath. <u>See</u> 44 F.3d at 143. In particular, the Court Officer in <u>Amodeo</u> <u>I</u> was entitled to "all of the powers, privileges, and immunities of a person appointed pursuant to Rule 66 Fed.R.Civ.Pro. and which are customary for court appointed officers performing similar assignments." <u>Id.</u> (quotations omitted). Importantly, under the <u>Amodeo I</u> consent decree, the district court was charged with the authority and responsibility to enforce and grant relief from any of the consent decree's provisions. <u>Id.</u> at 146. In finding the Court Officer's report was a judicial document, the Second Circuit relied on the district court's authority to grant relief from the Court Officer's efforts and, in so doing, the necessity of the district court "considering the record of all proceedings." <u>Id.</u> In other words, for the <u>Amodeo I</u> district court to exercise its authority to grant relief from the Court Officer's judicial powers, it necessarily would rely on the record before it, including the Court Officer's report and any other pleadings filed by the parties. By contrast, the Department-appointed Monitor in this case exercises no judicial powers, and the Court is charged neither with enforcing or granting relief from the Monitor's efforts nor with playing any role in the Monitor's work. The absence in this case of the factors that rendered the Court Officer's report a judicial document in <u>Amodeo I</u> support the conclusion that the common law right of access does not attach to the Monitor's report.

In the event the Court determines that the Monitor's Report is a judicial document subject to the public right of access, the weight of the presumption of access would be extremely low.  See Amodeo II, 71 F.3d at 1049 ("the weight to be given the presumption of access … will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance.").  As discussed in more detail below, this presumption is easily overcome here by overwhelming competing considerations against public disclosure.

B.      First Amendment Right of Access

To determine whether a First Amendment right of access attaches, a court must consider whether the document has historically been available to the press and general public and plays a significant positive role in the functioning of the particular process in question (the "experience and logic" test) or whether it is derived from, or a necessary corollary of, the capacity to attend a relevant proceeding.

Documents used by the government to determine whether a defendant is abiding by the terms of a DPA have never been available to the press and general public. There are no public proceedings relating to charging decisions – indeed, those decisions are necessarily cloaked in secrecy.  See United States v. Haller, 837 F.2d 84, 87-88 (2d Cir. 1988) (internal quotation omitted) (finding "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings" because if grand jury proceedings became public, among other things, "prospective witnesses may be deterred from testifying, those who do testify may be less likely to do so truthfully, targets of investigations may flee, and person who are the subject of an ultimately meritless investigation may face public embarrassment.").  As such, the press and general public are generally not entitled to access to documents that inform these decisions, meaning that the First Amendment right of access does not apply to the Monitor's Report.  See also United States v. Belfort, No. 98 CR 0859, 2014 WL 2612508, at *4 (E.D.N.Y. June 11, 2014) (Gleeson, J.) (finding no First Amendment right of access to a list of victims' names when there is "no historic basis for disclosing the type of document and there is no 'logic' in public access to this information playing 'a significant positive role' in the process" and "[a]ccess to [the] information is [] in no respect 'a necessary corollary of the capacity to attend'" a relevant proceeding.).

C.      Competing Interests

Because there is no common law or First Amendment right of access to the Monitor's Report, the Court need not conduct the further analysis of balancing those rights against competing considerations.  However, in the event the Court concludes that either a common law or First Amendment right of access does attach, it must balance those rights against countervailing interests that nevertheless warrant sealing.  In cases where a First

Amendment right applies, the Court must make "specific, on the record findings []
demonstrating that closure is essential to preserve higher values and [the sealing] is narrowly
tailored to serve that interest." Lugosch, 435 F.3d at 120 (internal quotation omitted).

   In this case, if the Monitor's Report were to be made public: (1) the Monitor's
and the government's ability to assess whether HSBC is complying with the terms of the
DPA will be negatively impacted; (2) the ability of the FCA, Federal Reserve and other
regulators to fully discharge their supervisory responsibilities over HSBC will be negatively
affected; (3) criminals would be given a road map for exploiting current weaknesses in the
AML and sanctions compliance programs at HSBC and potentially other financial
institutions; and (4) the ability of monitors and regulators of other institutions to effectively
perform their duties would suffer.

   1. The Monitor's Ability to Assess HSBC's Compliance with the DPA

   If the Monitor's Report is made public, the Monitor's ability to assess whether
HSBC is complying with the terms of the DPA will be negatively impacted.  Indeed, the
government and the Monitor believe that there is a real possibility that the consequences of
public disclosure would be so great that the Monitor would be unable to perform the work he
is required to do under the terms of the DPA.  This danger of impairing law enforcement
activities is the type of countervailing interest that courts have found to overcome the
presumptive right to access judicial documents, especially in circumstances where law
enforcement is reliant on the cooperation of others who want or need confidentiality.  See
Amodeo II, 71 F.3d at 1050 ("Unlimited access, while perhaps aiding the professional and
public monitoring of courts, might adversely affect law enforcement interests or judicial
performance.  Officials with law enforcement responsibilities may be heavily reliant upon
the voluntary cooperation of persons who may want or need confidentiality.  If that
confidentiality cannot be assured, cooperation will not be forthcoming. … If release is
likely to cause persons in the particular or future cases to resist involvement where
cooperation is desirable, that effect should be weighed against the presumption of access.").
In this case, the cooperation of both foreign regulators and HSBC employees, both of whom
the Monitor relies on to execute his responsibilities under the DPA, will be negatively
affected if the Monitor's Report is publicly released.

   The cooperation of foreign regulators is essential to the Monitor's work.
Pursuant to the DPA, as well as the FCA and Federal Reserve agreements under which the
Monitor operates, the Monitor is required to conduct testing and make assessments of HSBC
Group Affiliates around the world.  Performing this function requires the cooperation of
foreign regulators.  It is the confidential nature of the Monitor's Report that "allows the
Monitor to operate with important support from banking regulators in the jurisdictions in

which HSBC Group operates."  Monitor's Letter at ¶ 8.  Indeed, according to the Monitor, many jurisdictions already visited by the Monitor in 2013 and 2014 agreed to allow the Monitor access only when they were given express assurances that his reports would remain confidential.  FCA Letter at ¶ 20(a).  Furthermore, according to the FCA, "[i]f the report was made public, there is a significant risk that these jurisdictions (and possibly others which the Monitor might wish to visit in 2015 and future years) would refuse to agree to allow the Monitor to assess HSBC's operations in those jurisdictions throughout the remaining term of the DPA."  Id.  Without access to HSBC Group Affiliates, the Monitor cannot properly assess HSBC's compliance with the terms of the DPA.

To be fully effective, the Monitor needs access to confidential client information, including, among other things, names, nationality, source of wealth, transaction history and suspicious activity alerts.  Monitor Letter at ¶ 8.  According to the Monitor, without this information, his ability to accurately assess HSBC's compliance with certain provisions of the DPA would be materially curtailed.  Id.  Based on meetings with more than a dozen regulators, the Monitor believes that the presumption of confidentiality has been a critical component in obtaining foreign regulators' agreement to access confidential client information and to rely on it in preparing his reports.  Monitor Letter at ¶ 9.  Specifically, "[i]n one European country, [the Monitor and his team] were told that if review of confidential materials were not restricted to the FCA, DOJ and [Federal Reserve], that country's regulator would limit our access to those materials."  Id.  Furthermore, as noted by the Malaysian regulator Bank Negara Malaysia, the Monitor was only granted access to confidential information in Malaysia based on assurances that the Report "would be treated with utmost confidentiality, consistent with the confidentiality provisions in our legislation i.e. the Financial Services Act 2013, the Islamic Financial Services Act 2013, the Central Bank of Malaysia Act 2009 and the Anti-Money Laundering, Anti-Terrorism Financing and Proceeds of Unlawful Activities Act 2001" and that the Report "would only be disclosed to DOJ, the Federal Reserve Board and UK's Financial Conduct Authority."  Bank Negara Letter at ¶ 2.  Therefore, if the Monitor's Report becomes public, even in countries where the Monitor is still permitted access, it is likely that his work will be negatively affected based on a lack of access to key information.

The Monitor also relies on the full, open and candid cooperation of HSBC employees.  According to the Monitor, to this point, he has received an appropriate level of cooperation from HSBC employees.  Monitor Letter at ¶ 11.  However, public disclosure of the Monitor's Report would likely negatively impact this cooperation.  The Monitor believes that "releasing this report publicly would have a chilling effect on [HSBC] employees, and the level of cooperation and candor I receive could decrease substantially.  The employees might well become concerned that they would suffer negative repercussions from their statements, or information they have provided, being made public."  Id.  The Hong Kong

Monetary Authority similarly believes that public disclosure of the Report may "inadvertently limit[] the extent to which whistle blowers and staff will come forward and candidly communicate with the Monitor." Hong Kong Monetary Authority Letter at 2. Furthermore, the FCA has said that "were key employees to be aware that future reports may criticise them by name or by title they may be less likely to continue to support HSBC's reform efforts, potentially leaving the organisation and ultimately slowing HSBC's progress." FCA Letter at ¶ 20(c). If any of these situations were to occur, according to the Monitor, "[t]he result would be that I have less information with which to make my findings and recommendations, which ultimately would not be to the benefit of the public or [HSBC]." Monitor's Letter at ¶ 11.

In addition to the effects on future cooperation, the employees who cooperated with the Monitor for this Report have a privacy interest in the information they provided, as they could face repercussions if the Report is made public. This Court has noted that "the privacy interests of innocent third parties … should weigh heavily in a court's balancing equation." Belfort, No. 98 CR 0859, 2014 WL 2612508, at *3 quoting Amodeo II, 71 F.3d at 1050-51. Therefore, given the potential harm to the innocent HSBC employees who cooperated with the Monitor, the Court should find that the employees' privacy interest outweighs any presumptive right to access. See id. (finding victims' privacy significantly outweighed common law right of access when the information sought was traditionally non-public and the potential harm to victims was significant.).

## 2. Regulators' Ability to Effectively Supervise

Aside from the effect on the Monitor's ability to fulfill his duties under the DPA, public disclosure of the Monitor's Report will impair the ability of regulators to effectively supervise HSBC. Given the overlapping responsibilities of the Monitor, any negative impact on his ability to perform under the DPA will similarly affect his ability to perform under the agreements with the FCA and Federal Reserve. According to the FCA, if the Monitor is unable to perform his functions under their agreement, "[t]he impact of this for the FCA would be that we would be unable to discharge fully our supervisory responsibilities in respect of HSBC Group and that the FCA's market integrity objective could be compromised." FCA Letter at ¶ 20(a).

Beyond the ability of the Monitor to perform under the various agreements, the FCA and the Federal Reserve have a regulatory interest in the information obtained in the Monitor's Report. Open and candid communications between financial institutions and regulators are critical to effective supervision. As the Federal Reserve points out, the information contained in the Monitor's Report is analogous to information protected by the bank examination privilege. "[T]he bank examination privilege – which protects the

10

confidentiality of certain deliberative information – exists to preserve the relationship between examiners and regulated organizations so that this type of communication will take place." Federal Reserve Letter at 3 citing In re Subpoena Served Upon Comptroller of Currency, 967 F.2d 630, 633-34 (D.C. Cir. 1992).  If confidentiality for this type of information is not protected, "[i]t could impact Federal Reserve examiners [], thereby reducing the effectiveness of the Federal Reserve's supervision."  Id.

>3.   A Road Map to Exploit Weaknesses at HSBC and Other Financial Institutions

The Monitor's Report identifies specific current deficiencies in HSBC's AML and sanctions compliance program that are in the process of remediation.  This includes deficiencies at the Group level as well as in specific countries.  As general examples, the Monitor identifies certain areas within HSBC Group where the understanding of money laundering and financial crime red flags continues to lag.  The Monitor also identifies areas where new compliance policies have not yet been implemented, including areas where the lack of due diligence currently exposes HSBC to serious money laundering and sanctions risks.  To be clear, the Monitor has not concluded that these deficiencies are the result of intentional misconduct or bad faith.  Rather, the fact that the Monitor's review to date has revealed areas in need of improvement demonstrates the benefits of the monitorship to ensure that these problems are identified and corrected.  However, if made public, these deficiencies could be exploited by those who would promote criminal activity, transfer the proceeds of crime, or evade U.S. sanctions.  Furthermore, the FCA has expressed concern that the deficiencies identified at HSBC could be used to exploit similar weaknesses at other banks.  FCA Letter at ¶ 23.  The law enforcement purpose behind the remedial measures in the DPA would be undermined if, in disclosing the Monitor's Report, the Monitor's work is used as a road map by criminal actors to exploit compliance weaknesses at HSBC and other banks.

>4.  Negative Impact on Other Cases

The consequences of public disclosure of the Monitor's Report will not only affect this case, but may negatively impact other current and future cases.  Foreign regulators around the world will take notice of whether or not this Report is publicly disclosed.  If the Report is disclosed, there is likely to be a presumption in other countries that these types of reports will be made public in other cases.  The FCA believes that this may lead some countries to refuse access to independent monitors of other organizations.  FCA Letter at ¶ 20(b).  Without the ability to effectively use independent monitors to scrutinize the behavior of complex global institutions, it becomes more difficult for the Department of Justice to meaningfully impose the types of remedial measures that prevent and deter financial crime.

Public disclosure of the Monitor's Report may also impact the relationship between the Department of Justice and financial regulators in the future when independent monitors are imposed.  In situations, like this case, where the Department of Justice and one or more regulators impose monitorships, there are efficiencies to be gained by appointing the same person to perform both roles.  When the same monitor is used, both the Department of Justice and the regulator benefit from the monitor's broader view of the organization.  Furthermore, appointing the same person as monitor avoids inconsistencies and inefficiencies that could arise when different people are assigned to assess similar aspects of a company's operations.

Despite these benefits, the Federal Reserve has indicated that if having the same monitor as the Department of Justice would increase the likelihood that a monitor's work would become public, "the Federal Reserve might feel compelled to forego the advantages of efficiency and the broad view of the organization that the monitor's work provides in order to protect the confidentiality of the [Federal Reserve's Independent Consultant's] work product."  Federal Reserve Letter at 4.  It is likely that other regulators might also reach similar conclusions.  Thus, if the Monitor's Report is publicly disclosed, the benefits of one individual serving as monitor for the Department of Justice and multiple financial regulators may be lost.

D.    Narrowly Tailored

If the Court finds that a First Amendment right of access applies, but that sealing is essential to preserve countervailing values, the Court must also find that the sealing is narrowly tailored to serve that interest.  See Lugosch, 435 F.3d at 120 (internal quotation omitted).  Given the nature of the interests at play in this case, sealing the entire Monitor's Report is necessary to serve those interests.

Filing a redacted copy of the Monitor's report is neither practicable nor likely to eliminate the confidentiality concerns of foreign and domestic regulators.  Foreign regulators would have no ultimate control over what is redacted.  Thus, the only way for foreign regulators to be sure that certain information is not publicly disclosed would be to refuse to give the Monitor access to certain information or jurisdictions or to refuse to allow the Monitor to share the results of his assessment with the Department of Justice (thereby undermining the primary purpose of the monitorship).  In other words, public disclosure of a redacted report would not preserve the Monitor's ability to carry out his mandate.

Furthermore, as both the Monitor and FCA point out, if all of the sensitive information were to be redacted from Report, which is approximately 1,000 pages long, what is left would be bereft of context, incomprehensible in parts, and more likely to mislead than inform the public.  Monitor's Letter at ¶ 13 and FCA Letter at ¶ 24.  In situations like this,

sealing the entire report is the appropriate, most narrowly tailored result.  See Amodeo II, 71 F.3d at 1052 (finding that sealing of "Part 1" of a report in its entirety was appropriate where it was "rendered unintelligible as a result of redactions" and "thus more likely to mislead than to inform the public.").  To date, the government has taken great care in its periodic reports to the Court to provide sufficient information and context regarding the Monitor's efforts and findings to assure the Court that "the implementation of the DPA remains within the bounds of lawfulness and respects the [Court's] integrity," Docket Entry 23 at 20, without revealing confidential information that would have one of the negative consequences discussed above.

IV.    Conclusion

        For the reasons set forth above, the government requests that the Court accept the Monitor's Report for filing under seal.  The Monitor's active and rigorous review of HSBC's operations helps the government ensure that HSBC meets the stringent requirements of the DPA.  Indeed, if HSBC fails to meet these requirements the government stands ready to impose consequences on the defendants.  The government requests that the Monitor's Report be sealed to ensure that the government receives the most comprehensive, unfettered information as to whether HSBC has fully complied with the DPA.


                                        Respectfully submitted,

                                        KELLY T. CURRIE
                                        Acting United States Attorney

                    By:        /s/
                                        Alexander A. Solomon
                                        Daniel S. Silver
                                        Assistant U.S. Attorneys
                                        (718) 254-6074/6034

13

M. KENDALL DAY
Chief, Asset Forfeiture and Money
Laundering Section
Criminal Division
United States Department of Justice

By:     _____/s/_____
Craig M. Timm
Deputy Chief
(202) 598-2279

cc:     Counsel for Defendants (via ECF)