# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff*,<br><br>v.<br><br>HSBC BANK USA, N.A. and<br>HSBC HOLDINGS PLC,<br><br>    *Defendants*. | Cr. No. 12-763<br><br><br>**AFFIDAVIT OF<br>MICHAEL G. CHERKASKY** |

Michael G. Cherkasky, Esq., being duly sworn, deposes and says:

1. Since July 22, 2013, I have served as the independent corporate compliance monitor (the "Monitor") for HSBC Holdings plc and its subsidiaries and affiliates (collectively, "HSBC Group" or "the Bank").

2. I was appointed as Monitor for HSBC Group pursuant to: a) the deferred prosecution agreement (the "DPA"), dated December 11, 2012, between the U.S. Department of Justice ("DOJ"), HSBC Holdings Plc ("Holdings"), and HSBC Bank USA, N.A. ("HBUS") in this matter; and b) a Direction (the "FCA Direction"), dated April 2, 2013, issued to Holdings by the UK Financial Conduct Authority ("FCA"). Additionally, under a related Order to Cease and Desist (the "FRB C&D"), dated December 11, 2012, issued to Holdings by the U.S. Board of Governors of the Federal Reserve System ("FRB"), the Bank appointed me as an Independent Consultant to perform certain tasks required by the FRB C&D. Each of these (together, the "DPA and Related Orders") concluded that HSBC Group had engaged in conduct that violated the money laundering and sanctions laws of the U.S. and UK.

3. Pursuant to the DPA and the FCA Direction, in January 2014, I issued a report (the "Initial Review Report"), which set forth my findings and assessment, based on information provided by HSBC Group, of the then-current and planned future states of HSBC Group's anti-money laundering ("AML") and sanctions compliance program, and I issued recommendations to HSBC Group.

4. Pursuant to the DPA and the FCA Direction, in January 2015, I issued the first of four required annual follow-up reports (the "First Annual Follow-Up Review Report"), which set forth my findings and assessment of the then-current state of HSBC Group's AML and sanctions compliance program and of the Bank's progress over the course of the preceding year in improving its AML and sanctions compliance program. My findings and assessment described in the First Annual Follow-Up

Review Report were based, among other things, on independent testing conducted by me and by the AML and sanctions compliance professionals who support me in my role as Monitor (the "Monitor Team"). I also issued additional recommendations to HSBC Group.

5. I understand that the Court has issued an order directing the DOJ to file with the Court the First Annual Follow-Up Review Report.

6. I likewise understand that the DOJ will request that the Court file the First Annual Follow-Up Review Report under seal.

7. I support a request by the DOJ to file the First Annual Follow-Up Review Report under seal. I do not take this position lightly, as I am a strong supporter of the interest of the public in transparency in government, and believe that issues involving money laundering and sanctions violations are important public issues. Further, I have no interest in keeping the status of HSBC Group's compliance with the DPA from public view. I do believe, however, that there are times when such interests must be balanced against competing interests, and I believe that this is a case where competing interests weigh in favor of maintaining the confidentiality of the First Annual Follow-Up Review Report. Simply put, confidentiality under these circumstances is in the best interests of an effective monitorship.

8. First, I believe that maintaining the non-public, confidential status of the First Annual Follow-Up Review Report, as set forth in paragraph 9 of Attachment B to the DPA, is in the interest of an effective monitorship because confidentiality allows the Monitor to operate with important support from banking regulators in the jurisdictions in which HSBC Group operates. As Monitor, I conduct testing and assessment activities throughout the world. To be fully effective, these activities should include to the extent possible examination of confidential client information, including, among other things, names, nationality, source of wealth, transaction history and suspicious activity alerts. Without this information, my ability to accurately assess HSBC Group's compliance with some of the provisions of the DPA could be materially negatively impacted.

9. HSBC Group is overseen by more than 400 regulators, and the availability of this critical client information is dependent on these regulators and the various laws and regulations of the different jurisdictions in which HSBC Group operates. I have had the opportunity to meet with representatives of these regulators as a group, as well as with more than a dozen individual regulators. In these interactions, the presumption of confidentiality has been a critical component in obtaining foreign regulators' agreement to access confidential client information and to rely on it in preparing my reports. For example, in one Asian jurisdiction the issue of confidentiality was a continual source of discussion, and my in-person assurance to those regulators that their countrymen's information would be reviewed in confidence – and the results shared only with the FCA, DOJ, and FRB – was crucial to being allowed to see unredacted client files. In one European country, we were told that if review of confidential materials were not restricted to the FCA, DOJ and FRB, that country's regulator would limit our access to those materials.

10. As a result of these experiences, I believe that, if the First Annual Follow-Up Review Report were to be made public, the level of support that I would receive from foreign banking regulators could decrease substantially. I believe that some regulators would be concerned that public disclosure of the work I conduct in their jurisdictions could interfere with their own work. Other regulators might believe that they would be criticized for failing to address any compliance deficiencies in HSBC Group's operations that I might identify, and could seek to preclude me from having an opportunity to identify those deficiencies in the first place. Accordingly, in light of the number of banking regulators with whom I have engaged and will continue to engage during the course of the monitorship, I believe that public disclosure of the report could trigger action by regulators that would negatively impact my work.

11. Second, I believe that maintaining the confidentiality of the First Annual Follow-Up Review Report is in the interest of an effective monitorship because it is clear to me that confidentiality encourages cooperation from the employees of HSBC Group. Much of my work as Monitor depends on full, open, and candid cooperation from employees at all levels of the Bank, and thus far, I have enjoyed an appropriate level of such cooperation from employees of HSBC Group. I believe, however, that releasing this report publicly would have a chilling effect on those employees, and the level of cooperation and candor that I would receive could decrease substantially. The employees might well become concerned that they would suffer negative repercussions from their statements, or information they have provided, being made public. The result would be that I would have less information with which to make my findings and recommendations, which ultimately would not be to the benefit of the public or the Bank.

12. Third, I believe that maintaining the confidentiality of the First Annual Follow-Up Review Report will help to ensure that those who seek to use HSBC Group's financial network to launder funds or violate the sanctions laws do not have sensitive information that they could use to further their criminal objectives. The First Annual Follow-Up Review Report identifies significant, current deficiencies in HSBC Group's AML and sanctions compliance program. If made public, those deficiencies could be exploited to promote criminal activity, to transfer or deposit the proceeds of crime, or to evade sanctions controls.

13. I have also considered the possibility that the DOJ might file a version of the First Annual Follow-Up Review Report that has sensitive information redacted. I believe that a redacted report that does not negatively impact the Monitor's work can be produced. However, the report with all of its components is more than 1,000 pages long, and if the sensitive factual content were to be redacted, the report likely would be materially changed. Such a redacted report might lack the factual support that gives it its critical context and meaning and might appear to be too conclusory to be persuasive, or even to be fully comprehensible.

Dated: June 1, 2015                     /s/ Michael G. Cherkasky
                                        Michael G. Cherkasky, Esq.