# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

June 1, 2015

By ECF

The Honorable John Gleeson
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: United States v. HSBC Bank USA, N.A. and HSBC Holdings plc
Criminal Docket No. 12-763 (JG)

Dear Judge Gleeson:

      This letter is respectfully submitted on behalf of HSBC Bank USA, N.A. and HSBC Holdings plc (together, "HSBC") in support of the application of the Department of Justice ("DOJ") to file HSBC's Corporate Compliance Monitor's January 20, 2015 Report (the "Report") under seal. HSBC joins in the DOJ application.

      For the reasons explained below, and particularly in the "novel" context of the exercise of the Court's supervisory power here, *United States* v. *HSBC Bank USA, N.A.*, 2013 WL 3306161, at *6 (E.D.N.Y. July 1, 2013), public disclosure of the Report would contradict the compelling confidentiality interests of the parties and a number of banking regulators, and would jeopardize the success of the entire Monitor engagement.

      These confidentiality interests far outweigh any common-law or constitutional right of public access to the Report or any portions of the Report. *See United States* v. *Belfort*, 2014 WL 2612508, at *2–4 (E.D.N.Y. June 11, 2014).

      As the Deferred Prosecution Agreement ("DPA") itself anticipated (*see* Dkt. No. 3-4 ¶ 9), the reports produced by the Monitor contain highly sensitive information regarding HSBC's anti-money laundering ("AML") and sanctions compliance programs, customers, employees, operations, and business. HSBC knew when it agreed to the terms of the DPA that, if the Monitorship was to function effectively, it would be necessary to provide the Monitor with access to the kinds of

information that HSBC would otherwise keep strictly confidential, not least because of applicable legal and regulatory requirements in the numerous jurisdictions in which it operates. It was thus essential to HSBC's agreement that its information would be provided to and held by the Monitor in the strictest confidence, and correspondingly that the Monitor's "reports and the contents thereof [were] intended to remain and shall remain non-public" except in very limited circumstances. (*Id.*)

HSBC has no hesitation in providing the Report to the Court under seal for its *in camera* review. But to now publicly disclose the contents of the Report, contrary to the DPA's terms, would undermine the settled expectations of HSBC, DOJ, and the Monitor. That understanding of confidentiality was critical not only to HSBC, but also to many of the financial regulators in jurisdictions where the Monitor sought and was provided access to HSBC's confidential information. As reflected in the DOJ submission and supporting materials filed today, HSBC would not have been able to persuade certain of its country regulators that the Monitor should be permitted this unprecedented level of access had it not been able to provide assurances of confidentiality. The supporting materials included a letter submitted by the U.K. Financial Conduct Authority, HSBC's home country regulator and the other authority for which the Monitor produced the Report. Voiding these understandings of confidentiality by publicly filing the Report would irreparably damage the integrity and efficacy of the entire Monitorship process.

Since the Monitorship commenced, HSBC has invested considerable time, effort, and resources to provide the Monitor with the fullest possible access to HSBC's confidential information necessary for the Monitor to assess and report on the effectiveness of HSBC's AML and sanctions compliance programs. In order to do so, HSBC established a robust framework for sharing confidential information with the Monitor and his team and adopted expansive interpretations, even where there might be a range of differing views, as to data privacy, bank secrecy, and outsourcing restrictions in certain jurisdictions. HSBC has taken these steps not only in fulfillment of its obligation under the DPA to cooperate with the Monitor, but also because it considers that it stands to benefit most from the Monitor's work if the Monitor's access is as unfettered as possible. The level of access that HSBC has provided has been in reliance on the DPA's requirement that the Monitor's reports are confidential.

The Monitor has made over 11,500 document requests resulting in the production of over two million pages of documents. HSBC has facilitated meetings between the Monitor's team and all levels of HSBC employees, from its senior leadership to front-line staff working in HSBC's businesses across the globe. More than 3,500 such meetings have taken place thus far during the Monitorship—over 2,000 were held in 2014 alone. HSBC has provided the Monitor with the information he has requested in accordance with the terms of the DPA, and has consistently instructed its employees to cooperate fully with the Monitor's team and to candidly provide all information requested by the Monitor. (*See* Dkt. No. 33 at 3–4.)

I.  **An effective Monitorship has been developed in reliance on the DPA's assurance of confidentiality.**

The expectation of confidentiality has been a foundation of the Monitorship from its inception. The confidentiality of the reports produced by the Monitor was a condition of HSBC's agreement to the DPA. And that confidentiality has been strictly observed thus far: all prior Monitor work product (including the Monitor's first report) has been tightly controlled and treated as highly confidential, and this Report was produced on the understanding that it would be maintained the same way.

The assurance of confidentiality for the Monitor's work has been critically important to a number of HSBC's financial regulators in jurisdictions where the Monitor has conducted his reviews. HSBC must comply with its legal and regulatory obligations and maintain positive and cooperative relationships with governmental regulators in all of the jurisdictions in which it operates. In most of the jurisdictions the Monitor has visited, the concept of an independent corporate compliance monitor is not well understood. Particularly where data privacy, bank secrecy, and outsourcing laws are more restrictive, HSBC has had to reassure certain regulators that, consistent with the DPA, any confidential information provided to the Monitor would be adequately protected from disclosure to third parties or the public. For this reason, public disclosure of the Monitor's Report would undermine the trust, confidence, and credibility that HSBC has with its regulators.

In order to address the concerns of local regulators, mitigate the risk of disclosure of sensitive HSBC information, and maximize its ability to share confidential information, HSBC has positioned the Monitor as a service provider to the Bank and has established a robust information-sharing framework. That framework is based on the confidentiality requirements of the DPA.

The framework includes: 1) an engagement letter with the Monitor containing strict confidentiality provisions and confidentiality undertakings with individual Monitor Team members; 2) an overarching Data Transfer Framework Agreement ("DTFA") that imposes tight restrictions on the transfer and use of HSBC data consistent with applicable data privacy, bank secrecy, and outsourcing laws; 3) DTFA adoption agreements with HSBC entities in each of the jurisdictions visited by the Monitor that may impose additional restrictions on the Monitor before allowing access to confidential data originating from that jurisdiction; 4) in some cases, jurisdiction-specific confidentiality undertakings with individual members of the Monitor team who will be accessing data from that jurisdiction; and 5) special data storage and access requirements.

The contents of the Report confirm that those strict confidentiality protections are warranted. The Report incorporates confidential information from multiple jurisdictions, regulatory examination information affecting numerous regulators, and the statements of HSBC employees that were promised confidentiality as they shared information with the Monitor. Of particular regulatory concern in the United States, as reflected in the DOJ submission, the Report is based in part on documents discussing or

referring to Confidential Supervisory Information—information used by the Federal Reserve Board and the Office of the Comptroller of Currency that is protected from disclosure to encourage candid and open communication between financial institutions and their regulators. *See* 12 C.F.R. § 261.2(c)(1)(iii); 12 C.F.R. § 4.32(b). The Report also contains detailed information about HSBC's AML and sanctions compliance programs. For example, the Report details HSBC's practices with respect to investigating and filing Suspicious Activity Reports ("SARs"), its systems and controls for monitoring transactions, its "Know Your Customer" and Customer Due Diligence practices, and its ability to investigate financial crimes and remediate any compliance gaps exposed by internal investigations. These types of information are protected from public disclosure by the Bank Secrecy Act and related regulations. *See*, *e.g.*, 31 U.S.C. § 5318(g); 12 C.F.R. § 21.11(k).

The public disclosure of the Report would also likely lead to even more disclosures of confidential information beyond the contents of the Report itself. For example, the Report contains anonymized customer information, but in some instances a determined researcher could identify the referenced customer based on the Report. The disclosure of even that anonymized information would thus create a substantial risk of third-party subpoenas for more detailed information regarding those customers, or for the documents underlying and referenced in the Report. Those subpoenas in turn would create a greater risk that additional confidential information, including customer data, will become public.

HSBC has taken substantial steps to facilitate wide-ranging access by the Monitor to HSBC's confidential information, including customer data, and to assure local regulators of the confidentiality of the Monitor's work in reliance on the terms of the DPA. As noted, HSBC has no hesitation in submitting the Report under seal to the Court. But filing the Report publicly would be contrary to the DPA and fatal to the reliance and expectations of the parties and the affected financial regulators.

## II. Publicly disclosing the Report would compromise the Monitorship going forward.

HSBC agreed to a five-year monitorship. Not only would the public filing of the Report undermine the prior work of the Monitor, it would also threaten the effectiveness of the process in the future. If HSBC could not assure its foreign regulators that the Monitor's work will remain strictly confidential, those regulators could well object to HSBC sharing confidential information in the future. Without that access, the Monitorship would be crippled.

HSBC must also rely on its own employees to cooperate and be fully candid with the Monitor's team in order for the Monitorship to work as intended. As noted, Monitor team members have met with HSBC employees all over the globe, and HSBC has instructed its employees to provide their full cooperation and candor in those meetings. But as the DPA itself recognizes (Dkt. 3-4 ¶ 9), public disclosure of the information shared by those employees—on which the Report relies heavily in its assessment and recommendations—creates a serious risk of a chilling effect on the

candid exchange of information between HSBC employees and the Monitor. Maintaining the Report under seal will allow that protected channel to remain open.

The public disclosure of the Report would also threaten to undermine the very AML and sanctions controls that the DPA, Monitorship, and Report are designed to strengthen. The Report's detailed discussion of particular systems and controls used to detect potential money laundering—as well as its recommendations for future improvements to those systems and controls—could well facilitate financial crime by providing a roadmap to those seeking to avoid detection. These are precisely the law enforcement interests that the Court must weigh against the general principles of public access.

Filing and maintaining the Report under seal would allow this Court to fulfill its supervisory role without jeopardizing the candid cooperation that has characterized the relationship between HSBC and the Monitor, or interfering with law enforcement interests. *See United States* v. *Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) (placing weight on the fact that the monitor expressed concerns about cooperation if her report were publicly disclosed and "asserted that she would not have prepared the Report had she known it would have become public").

### III.    The entire Report must be filed under seal to protect these interests.

Even if it were feasible to redact the most confidential customer and law enforcement-sensitive data in the Report, such a public filing would still cause the same critical harms to HSBC's relationship with foreign financial regulators and the integrity and efficacy of the Monitorship going forward. To convince its foreign regulators to allow the Monitor full access to HSBC's confidential information, HSBC promised *full* confidentiality of the work the Monitor produces. If instead HSBC now had to explain to those regulators that only certain *parts* of the Monitor's reports will remain confidential (and that neither those regulators nor HSBC will have control over which parts are redacted), those regulators would likely withdraw consent to the process, resulting in a loss of Monitor access to protected data from those foreign jurisdictions.

The same effect will likely follow for HSBC employees, on whose candor and cooperation the success of the Monitorship depends. If employees anticipate that even portions of the Monitor's reports will become public, they may be far less willing to be fully candid with the Monitor's team for fear that information not deemed necessary to redact will identify or be traceable to them. To ensure that the Monitor has all the information necessary to assist HSBC in improving its AML and sanctions compliance programs worldwide, any such threat to employee candor must be avoided.

Because only the assurance of strict confidentiality of the Report in its entirety is sufficient to protect the integrity and efficacy of the Monitorship, this Court should allow the entire Report to be filed under seal.

## IV.    Conclusion

HSBC has made its cooperation with the Monitor its highest priority. It has taken substantial steps to reassure its regulators in jurisdictions with restrictive data privacy, bank secrecy, and outsourcing requirements that confidential information provided to the Monitor would not be disclosed to third parties or the public, and it has accepted the risk that those financial regulators or foreign courts might ultimately take a different view of how much information HSBC is permitted to share. HSBC accepted that risk in reliance on the DPA's terms providing that the Monitor's reports will remain confidential. HSBC's employees also rely on that assurance of confidentiality when they agree to communicate in full candor with the Monitor. In short, the understanding of confidentiality is one of the cornerstone terms of the entire Monitorship process.

That entire process will fail if the element of confidentiality is removed.

In weighing the competing considerations in deciding whether to allow the public to read the Report, the rationale for maintaining confidentiality far exceeds any right of access, whether common law or constitutional in origin. For these reasons, HSBC respectfully requests that the Court permit the Monitor's January 20, 2015 Report to be filed and maintained under seal in its entirety.

Sincerely,

Samuel W. Seymour
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Tel.: (212) 558-4000
Fax: (212) 558-3588

*Counsel for HSBC*

cc: All Counsel of Record